## NATIONAL LABOR RELATIONS BOARD, Petitioner–Appellant,

v.

## ELECTRO–VOICE, INCORPORATED, Respondent–Appellee.

No. 95–2611.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 11, 1996.

Decided April 26, 1996.*

---

* This opinion originally was released in typescript form.

1562

Karen M. Thornton, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, William T. Little, Saudria Bordone, N.L.R.B., Region 25, Indianapolis, IN, Ellen A. Farrell (argued), Corinna L. Metcalf, N.L.R.B., Injunction Litigation Branch, Washington, DC, for N.L.R.B.

Thomas J. Barnes (argued), James R. Stadler, Joseph J. Vogan, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, for Electro–Voice, Inc.

Before ESCHBACH, COFFEY, and EVANS, Circuit Judges.

ESCHBACH, Circuit Judge.

The United States brought a petition in federal district court on behalf of the Regional Director of the National Labor Relations Board (collectively "the Director") requesting injunctive relief and a bargaining order pursuant to § 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j) (hereinafter "the Act"). In support of the petition, the Director presented evidence that the employer threatened plant closure, interrogated employees regarding union activity, solicited employees' grievances, remedied employees' grievances, and fired union organizers. The district court denied injunctive relief. Because we conclude that the district court based its decision on incorrect legal analysis and clearly erroneous factual findings, we REVERSE.

## I.

Electro–Voice, Inc.,[1] is a manufacturing company, with plants located in several locations: Buchanan, Michigan; Sevierville, Tennessee; Newport, Tennessee; and Mishawaka, Indiana. At the plant located in Mishawaka, Indiana, (hereinafter "the Indiana plant"), Electro–Voice manufactures fiberglass stadium horns, electronic crossover panels, and cables for military headsets. In June of 1994, the Indiana plant was home to approximately 30 production and maintenance employees. Plant Manager Dennis Northam and General Foreman Paul Grasso supervised the Indiana operation. Minnie Warren was the Human Resources Manager of the plant in Buchanan, Michigan. Although she was located in Michigan, she had oversight responsibility for human resources at the Indiana plant.

Around the beginning of 1992, Electro–Voice implemented a program called "Customers Are Our Real Employers," referenced by the acronym "CARE." The program was a form of "total quality management," designed to solicit the input of employees at all levels of the company regarding how to improve the quality of the company's products. Under the auspices of CARE, Electro–Voice regularly held employee meetings to solicit employees' concerns and questions on issues ranging from technology and equipment to the employees' work environment. Dennis Northam was responsible for implementing CARE at the Indiana plant. Northam informed Director of Quality Anthony Saw-

1. Electro–Voice, Inc.'s parent company is Mark IV Audio, Inc. In the interest of clarity, we shall refer to them collectively herein as "Electro–Voice" or "the company."

yer, who was responsible for the CARE program company-wide, that employees in the Indiana plant did not want to participate in formal CARE meetings. Therefore, Northam said he would implement CARE informally, if at all.

Implementation of the CARE program was not the only problem plaguing the Indiana plant. In late 1993, the Indiana plant experienced a decline in labor efficiency.[2] In January or February of 1994, employees began to voice their dissatisfaction with conditions at the plant. One of the employees, Pam Buford, phoned Minnie Warren to request a meeting with Warren to discuss the policies and conditions at the Indiana plant. Specifically, Buford indicated that employees were dissatisfied with Northam, the attendance policy, and working conditions in the plant. Unfortunately, Warren was too busy to address the matter. Two weeks later Northam and Grasso met with Indiana plant employees, telling employees that they knew that the employees had complained about conditions in the plant, and stating that no changes would be made. In May, employees approached supervisor Kathy Nash to request additional exhaust fans to alleviate the excessive heat and air pollution in the plant. Again, their request was denied.

In May, after receiving no response from her complaints, Buford began an effort to organize Indiana plant employees to form a union. First, she approached almost all of the employees at the plant. Next, in early June, Buford contacted Dana Fere, a representative of the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, AFL–CIO (hereinafter "the union"). On June 17, Buford and Fere held a meeting at a nearby restaurant; sixteen plant employees attended. The employees discussed the possibility of organizing, and agreed to meet again. Meanwhile, by early June of 1994, Warren had received other complaints about the Indiana plant, including allegations of employee drug use.

On June 21, Indiana plant employee Scott Ressler played golf with Ronald Graham.[3] Graham was the Vice President of Human Resources for Electro–Voice and maintained his office at the Michigan plant. Ressler told Graham that the Indiana plant was suffering as a result of Northam's mismanagement and that attendance at the plant was becoming a "joke." According to Warren, Ressler also told Graham that "there were some union rumors" in the Indiana plant.

Graham returned to the Michigan office, and ordered Warren to go to the Indiana plant and to individually interview plant employees.[4] The parties offer different explanations for why Graham sent Warren. The Director maintains that Graham told Warren to defuse the union effort. Electro–Voice maintains that Warren was sent to address employee complaints and to investigate the drug allegations. Regardless, on June 22, 1994, Warren met with employees at the Indiana plant, informing them that she would meet with them individually over the next few days to discuss problems at the plant.[5]

Also on June 22, twenty-one employees attended a second union meeting. The employees signed union authorization cards and gave them to union representative Al Warzecha. Eleven employees volunteered to serve on a union organizing committee,[6] including Michelle Kincses, Scott Kendall, David E. Shaffer, Jason Havens, Pam Buford, and Tracy Dermody. As the meeting concluded, employee Kevin Wolverton arrived. Wolverton was not invited to the union meeting. Apparently angry about receiving no invita-

**2.** Electro–Voice concedes that the efficiency problem was "largely the result of mismanagement by Northam, who had all but abandoned the CARE process." (Appellee's Brief at 5).

**3.** Graham claims that he played golf with Ressler on June 1st. He also claims that the game occurred one week after June 14. (Joint Appendix at 311). It appears that Graham's reference to June 1 was an error, and that the game occurred on June 21.

**4.** Graham maintains that Warren was ordered to conduct individual interviews to conceal from Northam employees' comments and identities.

**5.** Electro–Voice concedes that Warren had heard rumors of union organizing activities prior to meeting with employees at the Indiana plant.

**6.** The committee functioned to inform employees about the union effort.

tion, Wolverton said that Northam knew about the meeting and would fire anyone involved in the union effort.

On June 23 through June 29, 1994, Warren met with employees individually. During the interviews Warren asked employees whether they had any complaints. Employees complained about their working environment, the ventilation in the plant, the lack of proper tools, and the absentee policy. Warren promised to investigate the complaints. However, Warren also allegedly discussed the union on at least three occasions. December Barrows claims that Warren said that Warren was once in the union and that the union would not help employees in the Indiana plant. Warren allegedly told Michelle Kincses that her personal experience suggested that the union was of little or no help to workers. Warren also supposedly inquired of Kincses whether Kincses would vote for the union and whether a majority of employees would do so. According to Scott Kendall, Warren told him that the union lacked the support of enough employees to unionize. Warren denies making any of these statements.

On June 27, Electro–Voice terminated Northam. Jay Melton, the Director of Manufacturing and Northam's superior, replaced Northam. Melton met with the Indiana plant employees, promising to improve conditions and review the attendance policy. Melton also allegedly vowed that the Indiana plant would never be a union shop.[7] According to Barrows and Kincses, Melton threatened to close the Indiana plant if the employees organized, noting that the Texas plant would take over the work of the Indiana plant. Finally, according to Tracy Dermody, Melton said that a union was not able to either protect the employees' jobs or secure for them higher wages. Melton contends that he spoke only from prepared note cards that contain no reference to the union.[8] Melton claims that he was unaware of the union effort until June 28, 1994, when he was informed of union activity by plant employee Don Simon. Electro–Voice concedes only

that during the speech Melton pledged to "give serious consideration to [employees'] concerns" and discussed "the need to produce quality products at a competitive price."

On June 29, Melton held another meeting with Indiana plant employees. Although the purpose of the meeting supposedly was to discuss the CARE program, Electro–Voice concedes that Melton discussed the union effort, said that "there was no need for a union," and encouraged employees not to give up their independence. Melton also discussed the consequences to the plant of "not remaining competitive." Again, employees claimed that anti-union threats were made. Melton denies making any threats.

Following the June 29 meeting, Melton joined Warren to continue conducting individual interviews with employees. Melton allegedly asked questions regarding employees' grievances, and renewed his verbal assault on the union. Melton allegedly told Tracy Dermody that "the Union can't protect your job" and that the plant was "small and movable." Melton allegedly made similar comments to Kincses, and asked whether Kincses or any other employee had signed a union authorization card. Warren and Melton jointly met with Pam Buford. They allegedly inquired whether Buford was responsible for organizing the union activity or knew who was. According to Buford, they assured her that the company would not tolerate the unionization of the Indiana plant. Warren and Melton deny the charges.

Warren returned to the Michigan plant following the June 29 meetings. Warren claims that she reported to Graham that the absenteeism problem in the Indiana plant was serious. On June 30, 1994, however, the company's "absentee point system" for tracking employee absenteeism was made less restrictive. Meanwhile, back in Indiana, Buford held another union organizational meeting on July 5, 1994 to determine whether the employees wanted to continue the union effort in the light of Warren's and

---

7. Employees Jason Havens and Tracy Dermody maintain that Melton made the statement during his speech to employees.

8. At least two other plant employees have no recollection of Melton making the alleged statements.

Melton's meetings. All but one of the 12 to 15 employees who attended the meeting voted to proceed.

On July 7, Graham, Grasso, Melton, and Warren met at the Indiana plant. Just after the meeting started, Melton presented Graham with a letter from the union demanding recognition at the Indiana plant. After receiving the letter, Graham decided that any employee with a high incidence of absenteeism should be discharged.[9] Graham ordered terminated every employee at the Indiana plant who had accumulated more than seven absentee points or who had been employed by the company for less than six months and had accumulated "a good number of points."[10] Graham ordered the terminations despite the fact that the company's written attendance policy provided that employees are subject to discharge after accumulating thirteen or more points in a twelve month period.[11] In fact, the company's absentee policy provided that "an absentee control policy and procedure is necessary to assure that those who are excessively absent are notified. . . ." But the employees Graham terminated received no notice that they were at risk of termination. Conveniently for the company, the employees that met Graham's criteria were December Barrows, Tracie Bentley, Pam Buford, Tracy Dermody, Jason Havens, Scott Kendall, Michelle Kincses, Sherry Mize, and Debbie Lello. Each of the foregoing had attended a union meeting and signed a union card. Five of the nine had volunteered to serve on the organizing committee.[12] Graham asserts that the decision was in response to employees' viewing the attendance policy as a "joke" and threats by key employees to quit if the policy was not enforced. Graham also disavows any knowledge of the terminated employees' union activities.

The employees were immediately fired and replaced by personnel from a temporary employment service.[13] On July 8, the union held another meeting. This time, only one or two company employees attended. The turnout was small, despite some evidence that support for the union among plant workers remained high. Other company employees informed a union representative that they feared losing their jobs. After the terminations, the company continued to remedy employee objections in the Indiana plant, including providing the fans and tools requested by employees, and adding seating in the employee break room. No union meetings have been held since the meeting on July 8.

Also on July 8, the union filed an unfair labor practice charge, alleging that Electro–Voice terminated six of the employees for engaging in union activity, and that Electro–Voice interfered with or coerced employees for engaging in union activity. On July 19, the charge was amended to include all ten employees terminated—including David Shaffer who was terminated on July 6. The amended charge also alleged that Electro–Voice threatened to close the Indiana plant if the employees unionized. On August 30,

---

9. While serving as Vice President, Graham had never personally participated in the discharge of an hourly employee.

10. Graham never defined how many points equal a "good number" of points.

11. The company's attendance policy provided for progressive discipline for absenteeism. Employees received "one point" for each absence, regardless of the reason for the absence. Under the terms of the policy, the third point resulted in a verbal warning, the fifth point resulted in a written warning, the seventh point resulted in a one-day suspension, the tenth point resulted in a five-day suspension, and the thirteenth point resulted in the employee's discharge.

12. Another Indiana plant employee, David Shaffer, was terminated by Grasso on July 6. Shaffer also had attended union meetings and signed a union card. When Shaffer inquired whether he was terminated because of his union activities, he claims that Grasso smirked. The letter of termination given to Shaffer was identical to the letter given to the employees terminated on July 7. Electro–Voice maintains that Shaffer's termination was not linked to the terminations on July 7. According to Grasso, Shaffer's termination was justified because he fought with a co-worker, broke several thousand dollars worth of horns, and missed work twice—all in eight weeks.

13. One employee who met Graham's criteria, Debbie Lello, was spared. After intervention by Warren on Lello's behalf, an exception was made for Lello because her absences were the result of protracted divorce proceedings.

1994, the union filed a second amended charge requesting a bargaining order and injunctive relief pursuant to § 10(j). On October 18, 1994, the Director issued a complaint, charging Electro–Voice with violations of §§ 8(a)(1), (3) and (5) of the Act, 29 U.S.C. § 158(a)(1), (3) and (5), including: (1) unlawful discharge, (2) unlawful plant closing threats, (3) unlawful statements regarding the "futility" of union organization, (4) unlawful solicitation of complaints and promises of benefits, (5) unlawful surveillance of union activity, and (6) unlawful granting of benefits. In October, following the Director's complaint, the company reinstated employees Bentley, Kincses, Dermody, and Mize.

On December 19, 1994, an Administrative Law Judge (hereinafter "ALJ") began hearing the case. The next day, December 20, the United States petitioned the federal district court for injunctive relief on behalf of the Director pursuant to § 10(j). The ALJ completed his hearing on January 19, 1995. The transcript of the proceedings before the ALJ was submitted to the district court. At the request of the Director, the district court did not conduct an evidentiary hearing; the court heard no live testimony. Rather than conducting a formal hearing, the district court relied on the record before the ALJ supplemented with additional evidentiary materials.

On May 4, 1995, 1995 WL 353146, the district court denied the Director's petition. The court held that: (1) the Director had no chance of success on the merits, (2) the harm to the company from an injunction outweighed the potential harm to the employees, (3) the employees would not be irreparably harmed absent an injunction, and (4) an injunction was not in the public's interest.[14] On June 5, 1995, the ALJ reached a conclusion that directly contradicts the district court's ruling. The ALJ found Electro–Voice guilty of all charges except surveillance. Electro–Voice filed exceptions to the

ALJ's opinion. Those exceptions are still pending before the National Labor Relations Board (hereinafter "the Board").

The Director brought this timely appeal from the district court's order denying injunctive relief. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1292(a)(1).

## II.

■ The Director seeks equitable relief: an "extraordinary remedy." *Szabo v. P\*I\*E Nationwide, Inc.*, 878 F.2d 207, 209 (7th Cir.1989). Section 10(j) relief should be granted "only in those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process." *Id.* Beyond the extraordinary nature of the relief sought, on appeal the Director must show that the district court abused its discretion in finding that injunctive relief is not "just and proper."[15] *Id.* In other words, we review the lower court's decision to see "whether it depends on faulty legal premises, clearly erroneous factual findings, or improper application of the criteria governing preliminary injunctive relief." *Kinney v. Pioneer Press*, 881 F.2d 485, 493 (7th Cir.1989). Nonetheless, the Director maintains that the lower court made legal errors and clearly erroneous factual findings that warrant reversal. We agree.

■ In *Pioneer Press*, we outlined the prevailing standard for evaluating § 10(j) petitions; the district court should issue an injunction before the Board has adjudicated a case where such equitable relief is "just and proper." *Id.* at 491. In determining what is just and proper, the district court should "evaluate the propriety of the Director's request with an eye toward the traditional equitable principles that normally guide such an inquiry." *Id.* at 490. We also outlined the four traditional criteria that a party must demonstrate in order to obtain

---

14. The district court also found that the Director was unlikely to prevail on the surveillance claim. The Director does not appeal that conclusion.

15. We note that the district court did not hear live testimony. The total record relied on by the district court is before us on appeal. Because

the district court did not have the opportunity to observe the demeanor of the witnesses, we need not be especially reluctant to hold that the district court reached clearly erroneous results. *See Best Medium Publishing Co., Inc. v. National Insider, Inc.*, 385 F.2d 384, 386 (7th Cir.1967).

injunctive relief: (1) no adequate remedy at law, (2) irreparable harm absent an injunction that exceeds the harm suffered by the other party as a result of the injunction, (3) a reasonable likelihood of success on the merits, and (4) "harm to the public interest stemming from the injunction that is tolerable in light of the benefits achieved by the relief." *Id.* at 490 n. 3. These criteria, or derivations thereof, have served as the prerequisites to § 10(j) relief. *Cf. Kinney v. Int'l Union of Operating Engineers, Local 150, AFL–CIO,* 994 F.2d 1271, 1275 (7th Cir.1993) (applying a slight variation of the aforementioned equitable criteria).

█ In the context of a § 10(j) petition, a federal court has no jurisdiction to pass on the merits of the underlying case before the Board. *Squillacote v. Graphic Arts International Union, Local 277,* 513 F.2d 1017, 1021 (7th Cir.1975). Rather, considering the aforementioned factors (including the Director's likelihood of success on the merits), the court's mission is to determine whether the harm to organizational efforts that will occur while the Board considers the case is so great as to permit persons violating the Act to accomplish their unlawful objectives, rendering the Board's remedial powers ineffectual. *Cf. Pioneer Press,* 881 F.2d at 487 ("If the delay [is] long enough, or the sin grave enough, the Board's order might come too late to do any good."). The Director is not entitled to prevail simply because she brings a charge.[16] But once the Director presents evidence sufficient to tip the scales in her favor, nothing more is required. "[N]o rule of law limits injunctive relief to 'serious and extraordinary circumstances.'" *Id.* at 493.

## A. The Director's Burden of Proof.

The parties in this case agree that the aforementioned equitable criteria apply.

However, they disagree over the applicable burden of proof. Electro–Voice maintains that the Director must establish each of the criteria by a preponderance of the evidence. The court below agreed, proclaiming that "the Seventh Circuit rejected the more lenient 'sliding scale approach'" in *P*I*E Nationwide, Inc.* The Director argues that § 10(j) analysis requires "sliding scale" analysis. Under the Director's approach, a weak showing under one of the equitable criteria can be offset by a stronger showing under another criterion. Because this issue seems to be the source of considerable confusion, we believe it requires clarification.

█ The equitable relief pursuant to § 10(j) is essentially a preliminary injunction. *P*I*E Nationwide, Inc.,* 878 F.2d at 209 (referring to § 10(j) relief as "temporary relief or a restraining order"). In *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386–87 (7th Cir.1984), we outlined the burdens incumbent upon a party seeking a preliminary injunction. In the context of a § 10(j) petition, we have compressed those requirements into a four-part test. First, the Director must show that she has no adequate remedy at law. *Id.* at 386. In other words, she must show that an award of damages would be "seriously deficient." *Id.* Second, the Director must demonstrate that "public harm" would result absent the injunction. *P*I*E Nationwide, Inc.,* 878 F.2d at 210. Third, the Director must show that the labor effort would be irreparably harmed absent the injunction, and that the irreparable harm outweighs any irreparable harm to the employer. *Roland Machinery Co.,* 749 F.2d at 386–87. The Director must satisfy the first two requirements by a preponderance of the evidence. The Director must also show irreparable harm by a preponderance of the evidence. However, the Director need not demonstrate that the harm to the labor effort outweighs the harm to the em-

---

16. The Director asserts that our inquiry is limited to whether contested factual issues could be resolved in the Director's favor, and that the Director is entitled to the benefit of the doubt. The Director relies on our holding in *Local 150.* In *Local 150,* we explained that the "reasonable cause" inquiry in § 10(*l*) analysis is limited to whether the Director could prevail on contested questions of fact, and noted that the Director is entitled to the benefit of the doubt. *Local 150,* 994 F.2d at 1278. The district court rejected the Director's argument, noting that in *Pioneer Press* we held that the "reasonable cause" inquiry is no longer a threshold requirement of § 10(j) analysis. *Pioneer Press,* 881 F.2d at 493. Our holding in this case does not turn on whether we give deference to the Director's interpretation of the facts. Thus, we decline to decide the issue.

ployer if the Director makes a strong showing under the fourth requirement. The fourth requirement is that the Director show that she has some likelihood of succeeding on the merits—that she has a "better than negligible" chance of winning. *Id.* at 387. Once the Director establishes some likelihood of success, "the court must then determine how likely that success is, because this affects the balance of relative harms.... The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor...." *Id.* at 387. In other words, a strong showing by the Director of likely success on the merits can offset a weak showing of harm.

As the foregoing makes clear, "sliding scale" analysis can occur only between the likelihood of success and the balancing of the harms. A strong showing under one can only off set a weaker showing under the other. A strong showing of likelihood of success or harm does not effect the Director's burden as to the other equitable criteria. The Director must satisfy the other criteria by a preponderance of the evidence.

### B. The Likelihood of Success on the Merits.

Having clarified the requisite analysis, we can turn to the merits of the case. We will address the equitable factors as they were considered by the district court. First, we consider whether the Director demonstrated a likelihood of success on the merits: a better than negligible chance of prevailing.

#### 1. Violations of Section 8(a)(3) of the Act.

Section 8(a)(3) of the Act prohibits employers from terminating employees solely on the basis of their union activities or sympathies. 29 U.S.C. § 158(a)(3). The employer's motivation for terminating employees is critical to the determination whether the terminations violate the Act. *N.L.R.B. v. So–White Freight Lines, Inc.,* 969 F.2d 401, 406 (7th Cir.1992). Where the evidence before the Board, circumstantial or otherwise, demonstrates that the discharges were driven by anti-union animus, the employer must demonstrate that he would have terminated the

employees for the proffered reason irrespective of union activity. *Northern Wire Corp v. N.L.R.B.,* 887 F.2d 1313, 1318 (7th Cir. 1989). The Director bears the burden of proving to the Board by a preponderance of the evidence that the terminations were motivated by a desire to thwart protected activity. *Chicago Tribune Co. v. N.L.R.B.,* 962 F.2d 712, 716 (7th Cir.1992). Once the Director meets her burden, the burden shifts to the employer to demonstrate by a preponderance of the evidence that he would have terminated the employees irrespective of the protected activity. *Id.* at 718.

The district court concluded that "[i]f the evidence of unfair labor practices is 'equivocal' or 'unclear,' the court should deny the petition for § 10(j) relief." The district court clearly applied a preponderance of the evidence standard. The court relied, in part, of *Johnston v. J.P. Stevens & Co.,* 57 L.R.R.M. (BNA) 2322, 2326 (W.D.S.C.1964), *enf'd,* 341 F.2d 891 (4th Cir.1965). In *Johnston,* the employer fired 14 of the 50 employees who notified the employer that they had joined a union. The court refused to issue a § 10(j) injunction because the evidence was equivocal whether the employer's conduct violated the law. The rule in *Johnston* is not the law of this circuit. Therefore, the district court applied the incorrect standard. In the context of a § 10(j) petition, the Director need not prove her case by a preponderance of the evidence. As we have already noted, in the context of § 10(j) petitions, the district court lacks the jurisdiction to reach the merits of the underlying claim. The Board will determine whether the Director has proven her case by a preponderance of the evidence. For our purposes, we must decide whether the Director has a better than negligible chance of success: whether the Director has "some chance" of succeeding on the merits. *Local 150,* 994 F.2d at 1279; *see Zipp v. Caterpillar, Inc.,* 858 F.Supp. 794, 798–99 (C.D.Ill.1994).

The evidence in this case clearly demonstrates that the Director has a "better than negligible" chance of prevailing on the merits. The Director presented testimony to suggest that Graham knew about union activity in the Indiana plant before he sent War-

ren to interview the employees. Testimony of some of the employees also suggests that Warren and Melton asked employees to identify union supporters. Electro–Voice concedes that Warren reported the information to Graham upon her return to the Michigan plant. The terminations followed shortly thereafter. From these circumstances, the Board could infer that Graham knew the identities of union supporters when he fired the employees on July 7.

Electro–Voice maintains that the employees were terminated to decrease absenteeism and increase efficiency. However, the Director presented evidence to suggest that Electro–Voice's explanation is pretextual. Graham had no clear standard for terminating employees; he terminated employees who were with the company less than six months who accumulated "a good number of points." Graham claimed that the reason for the July 7 meeting was to discuss the attendance policy because the policy "seemed too stringent." (Joint Appendix at 325). In fact, the attendance policy was amended and made less restrictive on June 30. But at the meeting in July, Graham applied an undefined standard to terminate the employees. Though Graham admitted that the attendance policy was too stringent, he terminated the employees without reviewing their files to consider whether they were victims of the policy's severity. Graham's actions, viewed in the light of his stated purpose for the meeting, simply make no sense. The implausibility of Graham's explanation lends credence to the Director's theory of the case. *N.L.R.B. v. Industrial Erectors, Inc.*, 712 F.2d 1131, 1137 (7th Cir.1983). Further, after the terminations, efficiency at the Indiana plant continued to plummet until October of 1994—the same month that Electro–Voice rehired four of the employees supposedly responsible for the efficiency problems.

Electro–Voice argues that because its other plants are unionized, and it has a history of cooperation with the union, the Director's accusations are implausible. But the Director introduced evidence suggesting that Electro–Voice had a financial incentive to thwart union development at the Indiana plant. The company risked losing the con-

tracts for the products it manufactured at the Indiana plant if its costs of production rose any further. According to Graham, "we had a situation with those products, where it was marginal whether or not they were in fact—whether in fact we could continue to be competitive with them." (Joint Appendix at 334). Higher operating costs in the form of increased employee benefits and wages often follow unionization. If the Indiana plant unionized, the company stood to loose business.

The district court held that "the Board is quite likely to find that Electro–Voice has established by a preponderance of the evidence that it would have discharged the employees regardless of their protected activity." The court based its conclusion upon its determination that Graham decided to terminate the employees because of absenteeism, and that the terminations were in conformity with Electro–Voice's attendance policy. Again, the test is whether the Director has a better than negligible chance of proving her case. We have already demonstrated that the Director's evidence seriously calls into question whether "attendance" was a pretext for the terminations. Further, the district court's conclusion that the terminations were necessarily in compliance with Electro–Voice's attendance policy is clearly erroneous. Although the policy reserved to the company the right to terminate employees with less than 13 absentee points, the circumstances of these terminations appear to be significantly distinct from the manner in which the company has terminated other employees. In this case, a vice-president of the company unilaterally formulated an imprecise standard to fire a block of employees, without notice to the employees and without reviewing their personnel files. Electro–Voice concedes that no other terminations at the company have occurred in that fashion.

Electro–Voice also argues that three of the employees, Havens, Kendall and Shaffer, were careless, wasted a lot of time at the plant, and allegedly lied on their employment applications. According to Electro–Voice, these factors served as partial motivations for terminating the employees. Electro–Voice claims that "there is direct proof that

the discharge decisions were based not only on issues of 'attendance,' but also, were based on issues of 'quality, productivity, . . . and work record.' " (Appellee's Brief at 25). The "direct proof" Electro–Voice refers to is the typed statements provided to the employees upon termination. The statements read, in part, "This review of the situation included quality, productivity, attendance, and work record." However, there is a substantial amount of evidence to contradict Electro–Voice's claim; the cornerstone of Electro–Voice's defense is that all of the terminations except Shaffer's were motivated by employee absenteeism. What is more, the very forms Electro–Voice refers to list "absenteeism" as the sole "nature of offense."

In sum, the timing of discharges and the manner in which the terminations were carried out, viewed in the light of the evidence suggesting that the company engaged in other anti-union practices and acted with anti-union animus, establish that the Director has a better than negligible chance of prevailing on the merits. The district court's conclusion to the contrary is clearly erroneous.[17]

We should emphasize that we express no opinion on the merits of the case itself. Our holding should not be taken as a finding in favor of the Director on the merits. Electro–Voice offers a plausible explanation for the terminations, and presented compelling evidence in support of its case. Just as there are credibility questions regarding Electro–Voice's witnesses, there are credibility questions regarding the Director's witnesses. Our presentation of the evidence herein is focused on the strength of the Director's evidence only because our inquiry is limited to whether the Director has a better than negligible chance of success. Our holding is similarly limited to a finding that the Director has such a chance.

### 2. Violations of Section 8(a)(1) of the Act.

▮▮▮ Next we turn to the Director's likelihood of success on the charges that Electro–Voice wrongfully solicited employee grievances, questioned employees about union activity, and threatened plant closure. Section 8(a)(1) of the Act provides that an attempt by an employer to interfere with, restrain, or coerce employees engaged in the process of unionization constitutes an unfair labor practice. 29 U.S.C. § 158(a)(1). We have held that the solicitation of employees' grievances combined with pledges to remedy those grievances with the intent of thwarting unionization violates § 8(a)(1). *N.L.R.B. v. Berger Transfer & Storage Co.*, 678 F.2d 679, 691 (7th Cir.1982). Likewise, granting benefits with an eye toward curbing union organization violates § 8(a)(1). *N.L.R.B. v. Rich's Precision Foundry, Inc.*, 667 F.2d 613, 625 (7th Cir.1981). Threatening plant closure or other reprisals for union activity violates § 8(a)(1) because "these acts reasonably tend to coerce employees in the exercise of their rights, regardless of whether they do, in fact, coerce." *Northern Wire Corp. v. N.L.R.B.*, 887 F.2d 1313, 1317 (7th Cir.1989). Employers also violate § 8(a)(1) when they interrogate employees about their union activities in circumstances that tend to interfere with organizational efforts. *N.L.R.B. v. Shelby Memorial Hosp. Ass'n*, 1 F.3d 550, 559 (7th Cir.1993).

Given our holding as to the terminations, we will address the remaining claims with brevity. The evidence clearly demonstrates that Electro–Voice solicited employee grievances, pledged to address the grievances, and acted to remedy the grievances. The only question is whether the Director has a better than negligible chance of proving that the company took these actions with the intent of thwarting the union effort. We have already discussed evidence that would support a finding that the company acted with anti-union animus.

The district court concluded that the Director has no chance of success on the merits because the employee interrogations were part of the company's "past and current poli-

---

17. We note that the circumstances surrounding Shaffer's termination are sufficiently distinct to warrant separate consideration. Electro–Voice presented evidence that Shaffer destroyed several thousand dollars worth of equipment, and would have been terminated regardless of his union activity. We concur with the district court that the Director has failed to establish a better than negligible chance that an anti-union animus motivated Shaffer's termination.

cy, if not practice, of soliciting employee grievances." *See Ichikoh Mfg., Inc.,* 312 N.L.R.B. 1022, 1024, 1993 WL 406323 (1993), *enf'd,* 41 F.3d 1507 (6th Cir.1994). Specifically, the court held that the interrogations were consistent with the company's CARE program. Although we agree that some evidence suggests that the interrogations were carried out pursuant to CARE, the record clearly provides sufficient evidence from which the Board could conclude that they were not. First, Northam notified Dennis Sawyer that at best CARE would be implemented "informally" at the Indiana plant. Second, by the time Melton replaced Northam, the company knew that the CARE program was foreign to Indiana plant employees. Third, interrogating employees about their union activity and deriding the union is unacceptable regardless of whether it is part of a past and current policy. Yet the Director presented evidence suggesting that such questions were proffered during the CARE "interviews." Finally, it appears that individually interrogating every employee at a plant over a period of a few days is at variance with the way in which CARE was implemented at the company's other plants. The Director has a better than negligible chance of establishing that the employee "interviews" violated the Act.

The district court also concluded that the changes made by Electro–Voice in response to employees' complaints were minor, and cannot seriously be said to have changed employees' views. However, whether a change is "minor" depends on who is asked. Electro–Voice removed Northam: a man that Electro–Voice describes as a tyrant. Electro–Voice also made changes at the plant, such as providing employees with ventilation fans, in direct response to employees' complaints. A gift of a fan to a polar bear is insignificant. A fan becomes a major concession when offered to a laborer in a sweltering factory who is subjected to air pollution

which causes skin irritation. The Indiana employees were the latter, not the former. The district court's conclusion that the nature of the concessions preclude a finding that they were offered to change employees' views is clearly erroneous.

Likewise, the Director introduced evidence via employee testimony that the Indiana plant's management threatened to close the plant if the employees organized, pledged that the plant would never be a union shop, and questioned employees about union activity in circumstances that could reasonably intimidate the employee with regard to union activity. Again the district court denied that the Director could prevail.[18] The problem, according to the district court, is that the company presented evidence contradicting the evidence presented by the Director. The court reasoned that whether the threats were made ultimately turns on determinations of credibility. According to the district court, where the question "rests on credibility alone" a court cannot find it probable that the threats were made. As we stated above, the district court applied the incorrect legal standard. Although the parties presented conflicting testimony, the Director proceeded under established legal theories and presented evidence sufficient to demonstrate that she has a better than negligible chance of prevailing before the Board.

### 3. Violations of Section 8(a)(5) of the Act.

The Director also contends that Electro–Voice violated § 8(a)(5) by refusing to recognize the union and engaging in conduct likely to undermine the union's majority support after the union properly requested recognition based on a "card based majority." Section 8(a)(5) of the Act provides that it is unlawful for an employer to refuse to bargain collectively with the representatives of his

---

18. The alleged questioning of the employees regarding union activity was conducted in individual interviews by the Indiana plant's management. Among other things, the alleged questioning pertained to the identity of persons involved in the union effort. The questions allegedly led some employees involved with the union to deny their involvement. Finally, the

record is devoid of evidence to suggest that the employees were assured that no reprisals would result from their responses. If the witnesses making these allegations are found credible by the Board, that finding would support a determination that the questioning violated the Act. *Shelby Memorial Hosp. Ass'n,* 1 F.3d at 559.

employees. 29 U.S.C. § 158(a)(5). In *Berger Transfer & Storage Co.*, we held:

> Although an employer generally has a right to refuse to recognize [a union based upon] a card based majority and to demand an election, an employer who engages in unfair labor practices "likely to destroy the union's majority and seriously impede the election" may not insist that before it bargains an election be held. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 600, 89 S.Ct. 1918, 1933, 23 L.Ed.2d 547 (1969). Therefore, when a union requests recognition and bargaining from an employer which was presented with cards showing a majority support for the union, and the employer subsequently engages in unfair labor practices which destroy the "laboratory conditions" needed for a fair election, the employer forfeits any right to an election and must bargain with the union or violate section 8(a)(5) of the Act.

*Berger Transfer & Storage Co.*, 678 F.2d at 693. The Board has the remedial power to issue a bargaining order where the employer's practices "have the tendency to undermine majority strength and impede the election process." *Id.* (citing *Gissel Packing Co.*, 395 U.S. at 614, 89 S.Ct. at 1940).

The district court concluded that the Director presented no evidence to demonstrate that the alleged acts undermined the union's chances of conducting a free and fair election. That conclusion is clearly in error. On June 22, twenty-two Indiana plant employees signed union authorization cards. Evidence suggests that on June 23, Electro–Voice began engaging in unfair labor practices. The day the union requested recognition, July 7, Electro–Voice fired one-third of its work force in the Indiana plant. As we will discuss below, the Director presented evidence that Electro–Voice's conduct had a substantial chilling effect on union activity in the Indiana plant. Further, the Director presented evidence that Electro–Voice's alleged conduct was pervasive, ranging from threats of plant closure to employee terminations. As we noted in *Justak Bros. and Co., Inc. v. N.L.R.B.*, 664 F.2d 1074 (7th Cir.1981), "[c]ommon sense recognizes the dramatic and long term effects" of such activity. *Id.*

at 1082. We find that the Director has a better than negligible chance of establishing that Electro–Voice violated § 8(a)(5) of the Act, and a better than negligible chance of obtaining a bargaining order from the Board.

## C. Irreparable Harm, Balancing the Equities, & the Adequacy of a Remedy at Law.

Next we turn to the equities of the parties. First, we must consider whether absent an injunction the employees' union effort will suffer irreparable harm. The Director argues that irreparable harm clearly will result from the chilling effect on the union effort, *P*I*E Nationwide, Inc.*, 878 F.2d at 210, and from the loss to employees of collective bargaining in the interim, *Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 27 (1st Cir.1986). We agree.

The district court concluded that the alleged chilling effect is "mere speculation at best." We do not understand how the district court reached that conclusion. The facts of this case demonstrate that the events at the Indiana plant have had a remarkable chilling effect on the employees' efforts to organize. On June 22, 1994, twenty-one Indiana plant employees attended a union meeting and signed union authorization cards. Several employee meetings, employee interrogations, and employee terminations later, and employee participation in the union effort has ground to a halt. Apparently no union meetings have occurred since July 8, 1994. There is some evidence that the employees reinstated by Electro–Voice in October of 1994 were considering an attempt to reorganize the union effort at the time the district court considered the case. However, the Director maintains, and Electro–Voice does not challenge, that no such meetings occurred and no union literature has been distributed. One union official testified that several employees are afraid to re-attempt union organization—afraid that they will be terminated because of their union efforts. The union official's testimony was corroborated by the testimony of other Indiana plant employees who remain employed by Electro–Voice.

The district court found no risk to the employees' unionization effort, concluding that "the dischargees, all but one of whom testified that they would return to Electro–Voice even if they found other employment, will be able to return to their positions and start up in the same place they left off with union organizing activities." The district court's conclusion turns a blind eye to the effect of the passage of time. As this case demonstrates, years may pass before the Board reaches the merits of a case. As time passes the likelihood of union formation diminishes, and the likelihood that the employees will be irreparably deprived of union representation increases. The "dischargees" will seek, and obtain, new employment. Their search may require them to move, or may lead them to a preferable job. Meanwhile, the employees remaining at the plant know what happened to the terminated employees, and fear that it will happen to them. The union's position in the plant may deteriorate to the point that effective organization and representation is no longer possible. As time passes, the benefits of unionization are lost and the spark to organize is extinguished. The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable. *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38 (2nd Cir.1975). That loss, combined with the likelihood that the Board's ability to rectify the harm is diminishing with time, equals a sufficient demonstration of irreparable harm to the collective bargaining process. For the same reasons we conclude that there is no adequate remedy at law.

Electro–Voice has offered no countervailing demonstration of irreparable harm that would result from a grant of injunctive relief. In balancing the harms, the district court found in favor of the company because the absenteeism and poor performance that would result from reinstating the terminated employees would adversely impact productivity and employee morale at the Indiana plant. The court's conclusion does not comport with the facts. The critical piece of evidence pertaining to labor efficiency at the Indiana plant is a chart produced by Electro–Voice tracking labor efficiency at the plant from January of 1993 through November of 1994. The chart demonstrates that labor efficiency at the plant fell by 3.5 percent from July of 1994 to September of 1994. In October of 1994, the month that four discharged employees were reinstated, efficiency increased by 10.1 percent. In November of 1994, efficiency increased another 28.3 percent and surpassed employee efficiency in January of 1993. If anything, the addition of the terminated employees seems to correlate with increased employee efficiency. In the light of this evidence, we cannot find that the reinstatement of the remaining terminated employees will endanger the efficiency of the Indiana plant.

As for employee morale, we believe that the terminated employees' absence from the Indiana plant may place employee morale at greater risk. The persons, especially Pam Buford, most active and most successful in organizing the employees have been removed from the work place. Their absence deprives the employees of the leadership they once enjoyed.

The company also claims that injunctive relief will render it unable to discipline the reinstated workers. The company contends that if it attempts discipline, it will be subject to additional unfair labor practice charges and possibly even contempt sanctions. The company's argument has no merit. The company always has the legal right to discipline an employee in a nondiscriminatory fashion for improper conduct. Further, any company subject to a § 10(j) injunction is theoretically subjected to the risk of which Electro–Voice complains. The presence of such a risk cannot be the talisman of "harm" analysis. Otherwise § 10(j) injunctive relief would never issue.

### D. The Public Interest.

■ Finally, we examine whether § 10(j) relief is in the "public interest." In *Pioneer Press* we defined the "public interest" analysis applicable in § 10(j) petitions as "harm to the public interest stemming from the injunction that is tolerable in light of the benefits achieved by the relief." *Pioneer Press*, 881 F.2d at 490 n. 3. In other words, when examining whether an injunction is in the

public interest, a court must weigh the potential public benefits against the potential public costs. The public interest is furthered, in part, by ensuring that "an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Miller, for and on Behalf of N.L.R.B. v. California Pacific Medical Center*, 19 F.3d 449 (9th Cir.1994). As we have noted above, there is evidence that the effectiveness of the Board's remedial powers will be circumscribed absent injunctive relief. There is no evidence that public harm would result from injunctive relief. Thus, injunctive relief is in the public interest.

The district court interpreted our holding in *P\*I\*E Nationwide, Inc.*, 878 F.2d at 210, to require proof that an injunction would further a public interest beyond preventing the remedial purpose of the Act from being undermined. The district court misread our holding. In *P\*I\*E Nationwide, Inc.*, we stated that "'courts should consider such factors as the need for an injunction to prevent frustration of the basic remedial purpose of the act....'" *Id.* at 210 (quoting *Squillacote v. Local 248, Meat & Allied Food Workers*, 534 F.2d 735, 744 (7th Cir.1976)). We found no public interest at risk in *P\*I\*E Nationwide, Inc.* because the underlying claim before the Board amounted to no more than a "simple individual discharge case." *Id.* However, "had there been allegations that PIE created a situation that could chill employee claims against it, then section 10(j) relief might be appropriate." *Id.*

### E. The Remedy: A Return to the Status Quo.

■ The district court refused to issue an interim bargaining order, in part, because the court concluded that the "status quo" to be preserved by such an order is the period prior to any union activity. According to the district court, a bargaining order would alter the appropriate status quo in this case because the union only received a card majority prior to the onslaught of Electro-Voice's alleged unfair labor practices. The district court relied on the Fifth Circuit's holding in *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185 (5th Cir.1975), *cert. denied*, 426

U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976). In *Pilot Freight Carriers, Inc.*, the court considered a case in which a majority of employees signed union authorization cards after the employer had begun committing unfair labor practices. *Id.* at 1190–91. The court of appeals affirmed a lower court's refusal to issue a bargaining order based on the authorization cards on the ground that "the status quo ante was the period prior to any union activity when the [employees] were unrepresented. An interim bargaining order would materially alter that status, creating by judicial fiat a relationship that never existed." *Id.* at 1194. In other words, the Fifth Circuit concluded that a federal court may not issue an interim bargaining order based upon a card majority because the union obtained the majority in temporal proximity to the unfair labor practices.

In *Trading Port, Inc.*, the Second Circuit reached a different conclusion. The Second Circuit considered a case in which a majority of employees signed union authorization cards before the employer commenced its campaign of unfair practices, but rejected the union in an election held after the campaign. The court reversed the district court's conclusion that "it is not just and proper for a district court to order bargaining, even though the Board is free to find on the merits that the union's previous card majority coupled with subsequent unfair labor practices by the employer justify such an order." *Trading Port, Inc.*, 517 F.2d at 37. The court reasoned that the only way to effectuate employees' rights pending a determination by the Board is to re-establish matters as they existed prior to the employer's activities. Specifically, the court reasoned:

Just as a cease and desist order without more is ineffective as final relief in a *Gissel* situation, it is, in certain cases, also insufficient as interim relief. If an employer faced with a union demand for recognition based on a card majority may engage in an extensive campaign of serious and pervasive unfair labor practices ..., and is then merely enjoined from repeating those already successful violations until final Board action is taken, the Board's adjudicatory machinery may well be rendered totally ineffective.... Only if the district

courts may issue interim bargaining orders can the union's viability be maintained to the degree necessary to make final Board adjudication in the form of an election or a bargaining order meaningful.

\* \* \* \* \* \*

[T]he status quo which deserves protection under § 10(j) is not the illegal status quo which has come into being as a result of the unfair labor practices being litigated. Instead, section 10(j) was intended as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices.

*Id.* at 37–38 (citations omitted).

At least two other circuits have adopted the Second Circuit's reasoning. *See Asseo v. Pan American Grain Co., Inc.*, 805 F.2d 23, 27–28 (1st Cir.1986); *Levine v. C & W Mining Co., Inc.*, 610 F.2d 432, 437 (6th Cir. 1979); *cf. Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874, 878 n. 5 (3rd Cir.1990) (adopting a position similar to the Second Circuit's). So do we. As the facts of this case make clear, alleged unfair labor practices can have an enormously destructive effect on organizational efforts. One month employees have an overwhelming card majority in favor of unionizing. The next month, having been confronted with threats of plant closing or termination, employees are afraid to attend a union meeting. Ordering an employer to cease his illegal activity, without more, will in some cases preserve the fallout of the illegal activity without preserving the Board's remedy. Absent a bargaining order, time works on the side of the employer-perpetrator to help him achieve his illegal purpose. Such a result is not contemplated by the Act.

### Conclusion.

The district court relied on incorrect legal analysis and reached clearly erroneous factual findings. We have the same record before us that was before the district court. The district court heard no testimony. Therefore, we find no need to remand this case for additional determinations. The Director presented a case sufficient to justify injunctive relief and an interim bargaining order. Electro–Voice should be enjoined from committing any unfair labor practices and required to reinstate the remaining employees terminated on July 7, 1994. Further, an interim bargaining order should issue requiring Electro–Voice to recognize, and bargain with, the union. The holding of the lower court to the contrary is

REVERSED AND REMANDED for further proceedings consistent with this opinion.