**Gail R. MORAN, Acting Regional Director of Region 13 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**LAFARGE NORTH AMERICA, INC., Respondent,**

and

**United Steelworkers of America, Local 1010, AFL–CIO, CLC, Party in Interest.**

No. 2:03–CV–176.

United States District Court, N.D. Indiana, Hammond Division.

Sept. 4, 2003.

Jessica Willis Muth, Brigid Barnicle, National Labor Relations Board—Chi/IL, Chicago, IL, for Gail R Moran, Acting Regional Director of Region 13 of the National Labor Relations Board for and on Behalf of the National Labor Relations Board, petitioner.

Harold Abrahamson, Abrahamson and Reed, Hammond, IN, Vincent J Pentima, Robert S Hawkins, Klett Lieber Rooney and Schorling PC, Christopher J. Rusek, Klett Rooney Lieber & Schorling, Philadelphia, PA, for Lafarge North America Inc, Local 1010 United Steel Workers of America, AFL–CIO CLC, respondents.

## ORDER

LOZANO, District Judge.

This matter is before the Court on the Petition for Temporary Injunction Under Section 10(j) of the National Labor Relations Act, as Amended, filed by Petitioner, Gail R. Moran,[1] on May 15, 2003. For the reasons set forth below, this Petition is **GRANTED**.

*BACKGROUND*

LaFarge North America, Inc. (Respondent) operates as a slag granulation facility at Ispat Inland's Indiana Harbor Works, a plant which is comprised of a collection of steel-related facilities in East Chicago, Indiana. Approximately 5,700 employees at Ispat's plant are represented by a labor union. Of those, approximately 5,600 are represented by Local 1010 of the United Steelworkers of America (Local 1010).

Local 1010 entered into its latest collective bargaining agreement with Ispat on August 1, 1999; it is valid through July 2004. This collective bargaining agreement basically prohibits contracting out

---

1. Petitioner is the Acting Regional Director of the Thirteenth Region of the National Labor Relations Board, and files the instant petition for and on behalf of the National Labor Relations Board.

any work capable of being performed by bargaining unit employees; the type of work subject to these provisions covers both inside and outside construction work done on Ispat's premises. In the past, employees represented by the United Steelworkers have performed slag removal at Blast Furnace No. 7. Thus, Local 1010 and Ispat were under the impression the collective bargaining agreement did not permit the contracting out of slag removal.

Sometime around the Spring of 1999, Respondent and Ispat began discussing the possibility of an agreement through which Respondent would build and operate a new slag processing facility as Blast Furnace No. 7 using a new advanced process. On or about December 20, 1999, Respondent met with Ispat and Local 1010 to discuss the construction, operation and manning of the proposed slag plant. Respondent was interested in having the prerogative to contract out the construction of the facility; however, pursuant to the collective bargaining agreement, Local 1010 expressed concerns because they maintained that slag removal was bargaining unit work. During the meeting, Respondent, with Ispat's participation, attempted to convince Local 1010 to waive their subcontracting protection under the collective bargaining agreement and allow Respondent to remove the slag. At the end of the meeting, Local 1010 indicated they would give Respondent's proposal serious consideration, but if they were going to give up their rights under the collective bargaining agreement, they needed Ispat to give them some incentives.

On January 7, 2000, Local 1010 again met with Respondent to discuss the proposed construction project. Local 1010 reiterated their concerns about the loss of Local 1010 union member jobs and asked questions regarding construction, operation and maintenance of the facility and the movement of slag. Respondent expressed concern about using the pattern contract normally used in the steel industry, and maintained that it was inappropriate for the proposed slag project. Respondent told Local 1010 that they wanted protection from a strike because, if there were a cessation in the removal of slag, a shutdown of Blast Furnace No. 7 could result in a shutdown of the entire plant operation. After the meeting, Respondent sent Local 1010 a copy of a collective bargaining agreement it had used for one of its Canadian slag facilities.

On January 18, 2000, Respondent sent Local 1010 a copy of Respondent's initial contract proposal. Three days later, Respondent again met with Local 1010 and discussed the terms of the proposed contract. Respondent agreed to recognize Local 1010 after a card check and also agreed to give preference to adversely affected Local 1010 members who were affected by the impact of the new slag facility. In addition, it was agreed that if Local 1010 got a majority status, that the subsequent agreement would become the contract.[2]

Between February 9, 2000 through March 14, 2000, Respondent and Local 1010 attempted to outline and resolve most of their outstanding issues. On March 14,

---

**2.** The cover letter to the initial contract proposal states, "It is LaFarge's understanding that once we are in operation and have hired a sufficient number of employees, we will give you their names and access. The Company will state to the employees that the Company favors Union representation of its employees with the Steelworkers. The Company will recognize the Union based on a card check. The attachment represents the agreement acceptable to the Steelworkers and you will recommend ratification to the LaFarge employees." Notably, this cover letter was not incorporated by reference to the proposed agreement or any subsequent agreements between Local 1010 and Respondent.

2000, Respondent sent Local 1010 a signed but undated copy of a proposed contract between Respondent and Local 1010 for Local 1010's approval and signature. Sometime after March 14, 2000, Local 1010 signed the contract, which did not have an effective bargaining date or specific termination date.[3] At this point, Respondent had not yet begun hiring any employees for the new slag granulation facility.

Respondent's slag granulation facility began construction in early 2001. In June 2001, Respondent hired Steve Marcus as plant manager for the new facility. A few months later, Respondent advertised in local newspapers for certain job openings and solicited resumes from various other sources as well. Ultimately, fourteen employees were hired through this effort.

In December 2001, Local 1010 met with a number of newly hired workers at Respondent's facility at its union hall. There, Local 1010 asked the workers to sign a Local 1010 authorization card, authorizing Local 1010 to represent them. By January 25, 2002, approximately 9 to 12 of the workers at Respondent's facility had signed the authorization card. This fact was communicated to Respondent. On that date, Respondent and Local 1010 formally signed, executed and ratified their contract of March 14, 2000.

On February 6, 2002, International Union of Operating Engineers, Local 150 (Local 150) Organizer, David Fagan, informed Marcus, that two employees, Jim Utley and Mike Hardin, were engaging in organizational activities for Local 150 at Respondent's East Chicago facility. By the middle of February, 17 of Respondent's employees signed revocation of authorization forms in an attempt to withdraw and revoke prior authorization of Local 1010 to represent them for purposes

of collective bargaining. A number of these workers then signed authorization cards authorizing Local 150 to be their collective bargaining representative. Local 150 filed a representation petition with the NLRB asserting that it be certified as the collective bargaining representative for Respondent's employees engaged in the slag production at the East Chicago facility.

In early May 2002, several of Respondent's supervisors distributed dues authorization cards for Local 1010 to hourly employees at the new slag facility pursuant to the union security and dues checkoff provisions of the contract with Local 1010. The hourly employees were instructed by the supervisors to turn the checkoff cards in to Respondent by about May 10, 2002.

Subsequently, Region 13 of the National Labor Relations Board (Petitioner) filed a complaint alleging unfair practice charges against Respondent. The thrust of Petitioner's complaint alleged the March 2000 contract, executed in January 2002, between Respondent and Local 1010 was illegal. In concert, Petitioner also contended Respondent engaged in numerous other unfair practices with regard to recognizing and authorizing Local 1010 to be its employees' collective bargaining representative. As a result, an Administrative Law Judge of the National Labor Relations Board (ALJ) conducted a full hearing on the merits of Petitioner's complaint. Because the ALJ had not issued a decision, on May 15, 2003, Petitioner filed the instant petition requesting this Court issue a preliminary injunction against Respondent in an attempt to have Respondent enjoined from continuing to engage in the alleged unfair practices pending final disposition of the matters pending before the NLRB.

---

3. Importantly, the signed March 2000 contract and the executed contract in 2002 are nearly identical in all material aspects.

After allowing the parties time to conduct discovery, this Court conducted a Section 10(j) proceeding on August 4 and 5, 2003. Upon completion of the proceeding, this Court took the instant petition under advisement and the parties were afforded time to provide further briefing. Subsequently, this Court was advised that the ALJ issued his decision and recommended order in the underlying administrative proceeding. The parties have provided the required briefing and this matter is now ripe for adjudication. In making the findings of whether a temporary injunction is just and proper, this Court considered the credibility of the witnesses.[4]

*DISCUSSION*

 Section 10(j) authorizes this Court to grant injunctions pending the NLRB's resolution of unfair labor practice proceedings. 29 U.S.C. § 160(j). The Seventh Circuit has held equitable relief pursuant to Section 10(j) is essentially a preliminary injunction. *Szabo v. P\*I\*E Nationwide, Inc.*, 878 F.2d 207, 209 (7th Cir.1989). In evaluating a Section 10(j) petition, this Court must determine whether such equitable relief is "just and proper." *Kinney v. Pioneer Press*, 881 F.2d 485, 491 (7th Cir.1989). To establish Section 10(j) relief is just and proper, Petitioner must show: 1) there is no adequate remedy at law; 2) public harm would result absent an injunction; 3) the labor effort would be irreparably harmed absent an injunction, and that harm exceeds the harm suffered by the employer as a result of the injunction; and 4) a reasonable likelihood of success on the merits. *NLRB v. Electro–Voice, Inc.*, 83 F.3d 1559, 1567 (7th Cir.1996).

The Seventh Circuit has clearly set forth the requisite proof scheme for the test enunciated above:

The [Petitioner] must satisfy the first two requirements by a preponderance of the evidence. The [Petitioner] must also show irreparable harm by a preponderance of the evidence. However, the [Petitioner] need not demonstrate that the harm to the labor effort outweighs the harm to the employer if the [Petitioner] makes a strong showing under the fourth requirement ... Once the [Petitioner] establishes some likelihood of success, "the court must then determine how likely that success is, because this affects the balance of relative harms ... The more likely the [Petitioner] is to win, the less heavily need the balance of harms weigh in his favor ... " In other words, a strong showing by the [Petitioner] of likely success on the merits can offset a weak showing of harm.

*Id.* at 1567–68(citations omitted).

*Likelihood of Success on the Merits*

 With regard to the likelihood of success on the merits, this Court is without jurisdiction to decide the merits of the underlying case before the ALJ. *Electro–Voice*, 83 F.3d at 1567(citing *Squillacote v. Graphic Arts Int'l Union, Local 277*, 513 F.2d 1017, 1021 (7th Cir.1975)). Rather, to demonstrate a likelihood of success on the merits, this Court must decide whether Petitioner has a "better than negligible chance of success." *Id.* at 1567–68. In determining whether Petitioner can demonstrate a likelihood of success on the merits, this Court must decide whether Petitioner presented sufficient evidence to the ALJ to prevail on the merits. *Id.*

 The parties are well aware of this Court's intention to gauge Petitioner's likelihood of success on the merits based on the administrative proceedings held before the ALJ. In the underlying proceedings, Petitioner alleged Respondent

---

4. Except in deciding the likelihood of success on the merits.

violated Sections 8(a)(1), (2) and (3) of the National Labor Relations Act (Act), 29 U.S.C. section 158(a)(1), (2) and (3).

First, Petitioner argues Respondent's actions of negotiating and entering into a contract with Local 1010 in March 2000, nearly a year and a half prior to Respondent hiring any employees were illegal. Petitioner maintains Respondent's recognition and contract are unlawful regardless of the agreed upon condition that Local 1010 must obtain majority support from Respondent's employees.

In addition, Petitioner claims the mere existence of the March 2000 agreement impermissibly tainted and interfered with Respondent's employees' ability to exercise their statutory right to a free choice of their collective bargaining representative. In support thereof, Petitioner relies on the testimony before the ALJ of Jimmy Harris, Ricky Wilson and Alex Garcia.

Harris testified that around October 2001 he was an unemployed member of Local 1010. Consequently, he went to Local 1010's business agent and inquired about job opportunities. Local 1010's business agent provided Harris with a job application form and fax number for Respondent and instructed him to accompany the application with a resume. The following month, Harris was interviewed for a position with Respondent by Marcus. According to Harris, after being asked about general work-related questions, Marcus told Harris Respondent would be a union company and that the Steelworkers would probably represent Respondent's employees. Harris was hired soon thereafter.

After being on the job for about a week, Harris went to Local 1010 to discuss his current wage scale. During the conversation, Local 1010's business agent showed Harris an undated copy of a contract signed by Respondent's attorney and Local 1010. Harris examined the wage structure and benefits provision contained within. Some time later, Harris again met with Local 1010's business agent and a representative of the Steelworkers International at Local 1010's union hall; Harris claims a number of Respondent's employees were also present. Harris testified that Local 1010's business agent showed the group the same signed, undated contract he had been shown on a prior occasion.

Not long after this meeting, John Rogers, a fellow employee at Respondent's facility asked Harris and thirteen other people to sign a Local 1010 authorization card. Harris claims he did not immediately sign the card, but admits he subsequently did sign.

According to Harris, on February 7, 2002, he signed a revocation of authority form revoking Local 1010's right to represent him. Harris admitted that a Local 150 organizer, Tim Utley, persuaded him to do so, in part by mentioning that employees at Respondent could possibly make more money by joining Local 150.

Ricky Wilson was approached by Marcus about his interest in employment with Respondent around September 2001. According to Wilson, Marcus and a supervisor, John Labery, interviewed him that month. During the interview, Wilson claims he asked Marcus whether Respondent would be unionized. Wilson alleges Marcus told him that he did not know, but then asked if Wilson was a part of Local 1010. Wilson answered in the affirmative and Marcus responded that this was "good." Subsequently, Wilson claims he was interviewed again by Marcus alone in November 2001. During the interview, Marcus was showing Wilson around the facility. Wilson claims he asked Marcus whether Respondent was going to be union, to which Marcus allegedly responded "yes, 1010."

Wilson stated that fellow employee John Rogers asked him to sign a Local 1010 authorization card sometime in the middle of December 2001. Wilson claims that he asked Rogers what would happen if he did not sign the card, to which Rogers responded he would be out of a job. Consequently, Wilson admitted signing the card.

Wilson claims to have attended a meeting with Local 1010 along with 10 or 12 of his co-workers. Wilson states that, at the beginning of the meeting, Local 1010'a business agent asked if everyone signed their cards, to which everyone said yes. According to Wilson, Local 1010's business agent then proceeded to talk about the contract and its relevant provisions. Wilson claims he asked the agent how the employees at Respondent are represented by Local 1010 when no one voted Local 1010 in as bargaining representative. According to Wilson, the agent responded saying that Local 1010 and Respondent had an agreement set up since 2000. In fact, Wilson claims the agent distributed copies of the contract to the employees at the meeting.

Wilson concedes that he signed a revocation of Local 1010's right to represent him on February 8, 2002, and was asked by Local 150's organizer, Tim Utley, to sign Local 150's union authorization card. Wilson stated he signed on with Local 150 because he thought it was in his best interest after talking with Utley.

Alex Garcia, a former employee at Respondent's facility, stated that he was initially interviewed by Marcus in November 2001. During the interview, according to Garcia, Marcus stated that he was looking to hire people who have worked at unionized companies because Respondent was a union company. Garcia claims that during the first day on the job, a fellow employee, Rogers approached him and gave him a Local 1010 authorization card to sign and return. According to Garcia, Rogers indi-

cated the card should be signed and returned as soon as possible because there was no union at the plant. Garcia signed and returned the card in December 2001.

Garcia stated that he, along with about twelve other co-workers attended a meeting at the Local 1010 hall. At this meeting, Garcia maintains Local 1010 business agent and an unidentified female presented the employees with a contract and told the employees "this was the contract we were going to have with LaFarge." Garcia recalled that the contract was signed and seemed pretty final, but conceded that Local 1010 representatives solicited criticism of the contract from the group.

Garcia stated that he decided to revoke the Local 1010 authorization and did so on February 7, 2002, via executing a revocation letter provided to him by Local 150 organizer, Tim Utley. Garcia testified that he signed a Local 150 authorization card the previous day and returned it to Utley. According to Garcia, Utley gave him the impression the benefits would be better with Local 150 than they were under the current system.

In rebuttal, Respondent denies that prospective and eventually hired employees were interfered with in their choice of collective bargaining representative when they were interviewed or later hired. In addition, Respondent asserts the pre-negotiated agreement and the later executed final agreement is legal.

Concerning its position that Respondent's employees' choice of collective bargaining representative was not interfered with, Responded relied on Marcus' testimony. Marcus testified that he was responsible for hiring at Respondent's facility. According to Marcus, when he was hired he did not know which of any unions would represent the hourly workers at Respondent's facility. In concert, Marcus stated that he gave no special consider-

ation to union members and had received no instruction from management to give any such consideration to union members.

With regard to the interview he had with job applicants, Marcus admitted that, when questioned about union representation, he would tell prospective employees that Respondent would "probably" be represented by a union but that was not his decision; rather, it was the employees' decision to make. Marcus denied telling any applicants that Respondent's facility would be union or that it would be represented by Local 1010, or that it was "good" that any applicant be affiliated with Local 1010. Indeed, Marcus denied asking any applicants about their respective union affiliation. According to Marcus, he first became aware that Local 1010 represented a majority of Respondent's work force on January 17, 2002. Prior to that, Marcus claims that he was not informed that Respondent had negotiated a contract with Local 1010.

Concerning Respondent's contention that the March 2000 negotiations between Local 1010 and itself were lawful—Respondent argues that it did not officially recognize Local 1010 as the representative of its employees until January 2002 and did not enter into an operative collective bargaining agreement until February 2002, which was after Local 1010 had obtained authorization cards from the majority of Respondent's employees. Further, Respondent maintains that negotiating the March 20, 2000 contract with Local 1010 is not unlawful because the agreement was tentative and contingent on Local 1010 obtaining majority status among Respondent's employees. Finally, Respondent submits that the situation here, arising out of a scenario including unionized integrated steel plant with an existing collective bargaining agreement, is distinguishable from a situation of an employer's opening a new plant with no union in place and then negotiating with a minority labor organization.

Each of the alleged unlawful actions will be addressed in turn.

1. *Respondent Contracts with Ispat to Operate a Slag Facility and Negotiates a Contract with the Steelworkers*

Petitioner's first claim is that Respondent's negotiations and entering into a contract with Local 1010 in March 2000, before Respondent hired any employees violates Section 8(a)(2) of the Act. Petitioner maintains the recognition and contract are unlawful regardless of the agreed upon condition that Local 1010 must obtain majority support from Respondent's employees. On this matter, Respondent's position is that it was lawful for it to negotiate and make agreements with Local 1010, as Local 1010 was an incumbent union that had valid work preservation rights to the work that Respondent wished to perform.

Section 8(a)(2) sets forth that it shall be an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it." [5] To that end, an employer recognizing a labor organization that does not have authorization from a majority of it employees, is usually in violation Section 8(a)(2). *Int'l Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); *A.M.A. Leasing, Ltd.*, 283 NLRB 1017, 1987 WL 89642 (1987) (finding Section 8(a)(2) violation where the employer recognized union and subsequently entered into a collective bargaining agreement all before the employer

**5.** Provided that subject to rules and regulations made and published by the Board pursuant to 29 U.S.C. section 156, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay.

began its normal operations). It is undisputed that Respondent negotiated and entered into a contract with Local 1010 in advance of beginning its operations, seemingly a clear violation of Section 8(a)(2).

In an attempt to circumvent this conclusion, Respondent maintains the negotiating and signing of the March 2000 contract with Local 1010 were proper because: 1) they were conditioned on Local 1010 gaining majority support from Respondent's employees; and 2) Local 1010 earned lawful work preservation rights through a history of representation.

With regard to Respondent's first argument, nowhere in the March 2000 contract does it indicate that Respondent's recognition of Local 1010 is contingent to it achieving majority status. Further, Article XVIII indicates the contract is the complete agreement between the parties and any agreements to the contrary had to be in writing. Thus, an employee could reasonably conclude that his collective bargaining representative was Local 1010. Consequently, this Court finds little merit in Respondent's argument. This conclusion is reinforced by this Court's findings concerning Respondent's actions toward employees regarding Local 1010's representation discussed below.

A major flaw with Respondent's second argument regarding work preservation rights is that Respondent fails to cite any persuasive authority in support thereof; rather, Respondent primarily relies on an Advice Memorandum, *General Motors Corp.,* Case No. 7–CB–6582 (June 7, 1986), and *Houston Division of the Kroger Co. v. Retail Clerks Intern. Ass'n Local No. 455,* 219 NLRB 388, 1975 WL 5788 (1975), a case that did not deal with an alleged Section 8(a)(2) violation as was presented here. Thus, this Court does not find Local 1010's alleged work preservation rights exorcize the illegality found in the March 2000 contract.

Indeed, as discussed in detail below, the March 2000, contract negotiated in advance by Respondent and Local 1010 unlawfully tainted Respondent's recognition of, bargaining with, and entering into an identical contract with Local 1010 in January 2002. Consequently, this Court finds Petitioner has a better than negligible chance of demonstrating an ultimate likelihood of success on the merits of this claim.

2. *Interviews*

Before the ALJ, Petitioner presented evidence that interviewees were told: 1) Respondent was "probably going to be union"; 2) Respondent was "looking at people that had worked with companies that were union companies because LaFarge was a union company"; 3) that employees would be represented by Local 1010; 4) that "the Steelworkers would probably represent LaFarge employees"; and 5) that it was "good" to have prior affiliation with the Steelworkers. Petitioner maintains the aforementioned comments, made prior to their authorizing Local 1010 to be their collective bargaining representative, runs afoul of Section 8(a)(1) of the Act.

Relying primarily on Marcus' testimony, Respondent denies Section 8(a)(1) was violated. Marcus largely denied making the alleged union based comments—only conceding that if an applicant asked about whether employees would be represented by a union or would be union, he would say probably but that the decision was left to the employees.

Remember, this Court's task is not to determine the merits of the underlying action. Rather, this Court must determine whether Petitioner presented the ALJ with sufficient information to establish a violation. Section 8(a)(1) provides, "[i]t shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the

rights guaranteed in Section 7." [6] Taking Garcia, Wilson and Harris' testimony as true, this Court finds Marcus' statements are enough to create a better than negligible chance that Petitioner will be successful on the merits of this claim.

### 3. Official Recognition of Local 1010

After Respondent's hourly workers were initially hired, those employees learned that Respondent and Local 1010 had already entered into a contract. Harris testified that after working at Respondent's facility for about a week, a representative of the Steelworkers showed him a signed contract entered into between Respondent and Local 1010. Harris then told other employee's at Respondent's facility about this contract. Subsequently, a majority of Respondent's employees signed authorization cards authorizing Local 1010 to be their collective bargaining representative. Petitioner claims the signed cards were tainted by Respondent's actions and, consequently, Respondent's verbal and written recognition violates Section 8(a)(2) of the Act.

Respondent claims there is no likelihood of success on this claim because Petitioner has failed to meet its burden of proof on this issue. In support of its position, Respondent only points to the testimony of Harris, Garcia and Wilson. Respondent notes that Harris admitted signing the Local 1010 authorization card, not because of Respondent's actions, but because he and his father knew the Steelworker business representative. Respondent also points out Garcia admitted that on his first day on the job, a co-worker asked him to sign the authorization card because there was no union at the Respondent's facility. Thus, Respondent argues Garcia understood that no labor union had been selected to represent the employees at Respondent's facilities. With regard to Wilson, Respondent requests this Court discredit his testimony.

Upon due consideration, Respondent's actions could be seen as coercive in nature. Indeed, the employees, even if not Garcia, Harris or Wilson, who saw the contract between Respondent and Local 1010 could reasonably have been led to believe that they were expected to sign Local 1010 authorization cards, in violation of Section 8(a)(2). *See Price Crusher Food Warehouse, Inc.*, 249 NLRB 433, 438–39, 1980 WL 11404 (1980). Therefore, Petitioner has a better than negligible chance of success on this claim.

### 4. Respondent's Contention That Its Collective Bargaining Agreement With Local 1010 Bars a Board Representation Proceeding

In early 2002, Local 150 began an organizational campaign among Respondent's employees. Local 150 solicited employees to revoke their authorization of Local 1010 and sign authorization cards for Local 150. As a result, a majority of employees revoked their authorization of Local 1010 and signed authorization cards on behalf of Local 150. Local 150 forwarded copies of the revocations to Respondent and filed a representation petition with the NLRB to enable the NLRB to conduct an election to determine which, if any, union employees wanted as their collective bargaining representative. Respondent took the position

---

**6.** Section 7 of the Act provides: Employees shall have the right to self-organize, to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and not to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities except to the extent that such right to refrain from any or all such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in Section 8(a)(3)

that Local 150's petition was barred pursuant to the contract between Local 1010 and itself.

Petitioner maintains Respondent used its illegally obtained contract to bar Local 150's petition, in violation of Section 8(a)(1) of the Act. In *R.J.E. Leasing Corp.*, the Board taught "that the very existence of a collective-bargaining agreement with a minority union, although not enforced, is sufficient to warrant finding a violation because such a document can be asserted as a bar to a representation petition filed by another labor organization." 262 NLRB 373, 380 (1982). Accordingly, this Court finds Petitioner has a better than negligible chance of success on this claim.

5. *Respondent's Distribution of Union Dues Cards*

During May 2002, Harris, Garcia and Wilson were asked to sign a union dues authorization card for Local 1010 by their respective supervisors. Where an employer and union enter into an unlawful Section 8(a)(2) agreement containing union security and dues checkoff provisions and when the employer attempts to enforce that provision by soliciting dues checkoff authorizations from employees, such action is in violation of Section 8(a)(3). *See A.M.A. Leasing, Ltd.*, 283 NLRB 1017, 1987 WL 89642 (1987).

As this Court has found Petitioner has a likelihood of success on the merits concerning the unlawfulness of the March 2000 negotiations and subsequent contract, this Court finds there is a better than negligible chance of Petitioner establishing Respondent soliciting dues checkoff authorizations from its employees violates Section 8(a)(3).

6. *ALJ's Subsequent Decision*

■ As the parties recognize, the ALJ recently issued his decision on the merits

of the underlying unfair practice charges. In his decision, the ALJ found Respondent to have committed all but one[7] of the alleged violations pled in the underlying action. Although the AlJ's decision is not binding on this Court, it is relevant in this Section 10(j) proceeding. "Assessing the [Petitioner's] likelihood of success calls for a predictive judgment about what the Board is likely to do with the case. The ALJ is the Board's first-level decisionmaker. Having presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the [Petitioner's] prospects of success may be weighed." *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir.2001). Further, the Board's established policy is not to overrule an administrative law judge's credibility resolutions unless the clear preponderance of all the relevant evidence convinces the Board that the ALJ is incorrect. *Standard Dry Wall Products*, 91 NLRB 544 (1950), *enfd.* 188 F.2d 362 (3d Cir.1951).

With this Court's findings along with the ALJ's decision, Petitioner not only has a better than negligible chance of success on the merits but, in fact, has a high likelihood of success in proving Respondent: 1) entered into an unlawful contract with Local 1010; 2) coerced Respondent's employees into authorizing Local 1010 to be their collective bargaining representative; 3) unlawfully recognized Local 1010 based upon coerced authorization; and 4) attempted to enforce the provisions of the unlawful contract.

*Irreparable Harm & No Adequate Remedy at Law*

■ This Court must consider whether, absent an injunction, the employees' union effort will suffer irreparable harm. Petitioner claims irreparable harm will be suffered in three ways: 1) the threat to em-

---

7. The ALJ found that Supervisor Jay Smith did not threaten employee Ricky Wilson with termination if he did no sign a dues authorization card for the Steelworkers.

ployees' Section 7 rights to select their own representative; 2) the threat of entrenchment of Local 1010 as their bargaining representative; and 3) the threatened frustration of the remedial purposes of the Act.

Petitioner claims the most substantial irreparable harm is the threat to employees who currently cannot exercise their right to vote for a collective bargaining representative of their choosing. On the contrary, Respondent claims that, because its employees will be allowed to vote on a new collective bargaining representative near the end of the current collective bargaining agreement—approximately June 2004—the inconvenience of waiting until then does not establish irreparable harm. This Court disagrees.

This Court has found that the current contract between Respondent and Local 1010 was, in all likelihood, entered into unlawfully. As a consequence, Respondent's employees whom Respondent did hire are currently working without the advocacy of their chosen representative. The conditions at Respondent's facility include there being no visible Local 1010 business representative and no Local 1010 union steward. Thus, the employees have no one to approach to discuss and/or file grievances on issues of concern. In addition, the current collective bargaining agreement between Local 1010 and Respondent includes a "no strike clause," which prohibits Respondent's employees from exercising their fundamental right to strike.

Assuming that either the Board ultimately orders Respondent to bargain with Local 150, or the employees vote on new representation in June 2004, such prospective relief cannot fully compensate Respondent's employees for the variety of benefits

that good-faith collective bargaining might otherwise have secured for them in the present. *Bloedorn*, 276 F.3d at 298–99; (citing *Squillacote v. U.S. Marine Corp.*, 116 LRRM 2663, 2665 (E.D.Wis.1984)). Indeed, concerning their right to choose Local 150 as their collective bargaining representative, the longer that Local 150 remains barred from representing employees at Respondent's facility, the less likely it is to be able to organize and represent those employees effectively if and when it commences bargaining. *See, e.g., Electro–Voice*, 83 F.3d at 1573. In sum, this Court believes, absent an injunction, the effect of the passage of time will irreparably harm Respondent's employees.

To note, Respondent puts a lot of faith in its "contract bar" argument. True, the contract bar rule generally requires enforcement of a valid collective bargaining agreement to its conclusion even though a majority of employees wish to change their union. Here, however, the circumstances are far different than the ordinary contract bar instance. This Court has found the current contract between Respondent and Local 1010 is likely unlawful. Being such, this Court has not been provided any authority, and is unpersuaded, that the contract bar would require the continued enforcement of such an unlawful contract to its fruition.

Petitioner claims Respondent's continued assistance to and recognition of Local 1010 has also caused irreparable harm to the rights of Respondent's employees by entrenching Local 1010 as the bargaining representative. In contrast, Respondent argues Local 1010 can not be entrenched, pointing out that Local 1010 has agreed to disclaim interest in representing its employees at the conclusion of the current contract.[8]

---

8. During the Section 10(j) proceeding, it was established that Local 1010 and Local 150 are

working out an agreement wherein at the conclusion of the current contract between

Upon due consideration, Petitioner has provided this Court with sufficient evidence to demonstrate Respondent's continued assistance and recognition of Local 1010 could cause irreparable harm to the rights of Respondent's employees by entrenching or attempting to entrench Local 1010. True, the evidence provides the current employees at Respondent's facility almost categorically support Local 150 as their future bargaining representative; however, the evidence also shows Respondent's employees who support Local 150 are getting frustrated with the lack of progress getting Local 150 recognized. In addition, absent an injunction, in the future, both the attrition of former and hiring of new employees could result in entrenchment of Local 1010. *Int'l Union of Garmet Workers*, 366 U.S. at 738, 81 S.Ct. 1603(reasoning that the minority union which receives employer recognition is given a "marked advantage" over other unions); *Kaynard v. Mego Corp.*, 633 F.2d 1026, 1035 (2d Cir.1980) ("The advantages of incumbency are potent indeed and may be corrosive of that free and uncoerced choice which forms the foundation of our system of collective bargaining."). Finally, although this Court notes that Local 1010 intends to disclaim any interest in Respondent's employees after the current contract between it and Respondent concludes, there are no such guarantees. Accordingly, Petitioner has shown this Court, by a preponderance of the evidence, that Local 1010's continued representation could cause its entrenchment at Respondent's facility.

■ Finally, Petitioner argues irreparable harm to the public interest will be caused if Respondent is able to frustrate the remedial purposes of the Act by continuing its unfair practice violations. In determining whether irreparable injury to

the policies of the Act is threatened, this Court must take into account "the probability that declining to issue the injunction will permit the allegedly unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Section 10(j) of the Act authorizes interim injunctive relief to maintain the status quo pending the Board's ultimate decision on the merits of the underlying unfair labor practice claims. *Fuchs v. Hood Industries*, 590 F.2d 395, 397 (1st Cir.1979). "[T]he status quo which deserves protection ... is not the illegal status quo ... Instead, section 10(j) was intended as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices." *Electro–Voice*, 83 F.3d at 1575(quoting *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir.1975). As described above, there is evidence that the effectiveness of the NLRB's remedial powers could likely be circumscribed absent injunctive relief. Thus, this Court finds Respondent's continued recognition of Local 1010 to be irreparable harm to the remedial purpose of the Act.

For the same reasons described in the commentary above, this Court concludes there is no adequate remedy at law. *See, e.g. Electro–Voice*, 83 F.3d at 1573.

*Public Interest*

■ When examining whether an injunction is in the public interest, this Court must weigh the potential public benefits against potential public costs. *Id.* at 1573–74. Petitioner claims there is a substantial public interest in dissipating the chill that Respondent's unfair labor practices have had on the exercise of Section 7 rights by

---

Local 1010 and Respondent, Local 1010 will disavow interest in Respondent's employees

in turn for Local 150 disavowing interest in another facility.

employees' to choose their own bargaining representative. Not surprisingly, Respondent argues the public interest does not favor a temporary injunction. Respondent claims there are no public benefits because neither Local 1010 or Local 150 have clean hands in this matter. What Respondent fails to mention, however, is that Respondent's employees do, in fact, have clean hands in this matter. Granting a temporary injunction would serve the public interest because it would ensure the employees will be able to exercise their Section 7 rights and facilitate the collective bargaining process. Although Respondent claims a temporary injunction would allow for the possibility of a labor dispute, there is no evidence that public harm would result from injunctive relief. Thus, injunctive relief is in the public interest.

*Balance of Harms*

■ As stated earlier, the likelihood of success and balancing of harm are evaluated on a "sliding scale." *Electro–Voice*, 83 F.3d at 1568. On one hand, Petitioner claims the violation of the Section 7 rights of Respondent's employees to be allowed to freely select the bargaining representative of their own choosing is harmful and ongoing. On the other hand, Respondent claims an injunction would deprive it of labor peace during the remaining year of the collective bargaining agreement. Respondent points out the cost of a work stoppage or picketing would be enormous. While this Court does not dispute that a work stoppage or picketing activity would likely result in large costs, Respondent has failed to point to any evidence suggesting that either a work stoppage or picketing would result from an injunction. Consequently, this Court finds the balance of harms weighs in favor of Petitioner. In any event, because Petitioner's likelihood of success is so strong, even if Petitioner had a weak showing here, this Court would still find a temporary injunction appropriate.

In sum, to preserve the status quo this Court finds it both just and proper to issue a temporary injunction.

*CONCLUSION*

■ For the reasons set forth above, this Petition is **GRANTED**. It is hereby **ORDERED** that, pending final disposition of the matters before the NLRB, LaFarge North America, Inc., and its officers, agents, representatives, servants, employees, attorneys, and all persons acting in concert or participation with it are **ENJOINED AND RESTRAINED FROM**, in any manner:

1. recognizing or bargaining with the United Steelworkers of America, Local 1010 unless and until it is certified as the exclusive bargaining representative of the Respondent's employees;

2. maintaining a collective bargaining agreement with the United Steelworkers of America, Local 1010, containing a union security clause which imposes conditions of employment requiring employees to pay union dues and/or their share for representational purposes to United Steelworkers of America; Local 1010, as a condition for continued employment;

3. in any like or related manner interfering with, restraining or coercing its employees in the free exercise of their Section 7 rights, or in any like or related manner rendering unlawful assistance to United Steelworkers of America, Local 1010.

LaFarge North America, Inc, its officers, agent, representatives, servants, employees, attorneys, and all persons acting in concert or participation with it are **ORDERED** to do the following:

1. withdraw and withhold all recognition from United Steelworkers of

America, Local 1010, as the representative of employees of LaFarge North America, Inc., unless and until United Steelworkers of America, Local 1010 has been certified by the National Labor Relations Board as the exclusive collective bargaining representative of those employees;

2. cease and desist from giving effect to the collective bargaining agreement between LaFarge North America, Inc. and the United Steelworkers of America, Local 1010; provided, however, that nothing in this order shall require as provided herein, that LaFarge North America, Inc. vary or abandon any existing wages or benefits of its employees established by the United Steelworkers of America, Local 1010 collective bargaining agreement;

3. post copies of this Court's order at LaFarge North America, Inc.'s facility where notices to employees are customarily posted, said posting to be maintained during the Board's administrative proceedings, free from all obstructions and defacements, and agents of the Board to be granted reasonable access to Respondent's facility to monitor compliance with the posting requirement; and

4. within 20 days of the issuance of this order, file with this Court, with a copy sent to the Regional Director of the Board for Region 13, a sworn affidavit from a responsible official of LaFarge North America, Inc., setting forth with specificity, the manner in which LaFarge North America, Inc. has complied with the terms of this order, including how the documents have been posted as required by this order.