154 F.3d 276
 135 Lab.Cas. P 10,211
 William C. SCHAUB, Regional Director of the Seventh Region
of the National Labor Relations Board, for and on
behalf of the National Labor Relations
Board, Petitioner-Appellant,
v.
DETROIT NEWSPAPER AGENCY, d/b/a Detroit Newspapers; The
Detroit News Inc.; Detroit Free Press,
Incorporated, Respondents-Appellees.
 No. 97-1920.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 10, 1998.
Decided May 6, 1998.*
 
 Ellen A. Farrell, Dep. Asso. Gen. Counsel (argued and briefed), National Labor Relations Board, Judith I. Katz (briefed), Robert E. Omberg (briefed), National Labor Relations Board, Injunction Litigation Branch, Washington, DC, for Petitioner-Appellant.
 Jeremy P. Sherman (briefed), Kristin E. Michaels (briefed), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, James A. Rydzel (briefed), Jones, Day, Reavis & Pogue, Cleveland, OH, Richard F. Shaw (briefed), Timothy B. Dyk (briefed), Daniel H. Bromberg (briefed), Harry I. Johnson, III, Clinton R. Pinyan, Jones, Day, Reavis & Pogue, Washington, DC, Robert M. Vercruysse (briefed), Ann M. Nicklas (briefed), Vercruysse, Metz & Murray, Bingham Farms, MI, for Detroit Newspaper Agency and The Detroit News Inc.
 Jeremy P. Sherman (briefed), Kristin E. Michaels (briefed), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, James A. Rydzel (briefed), Jones, Day, Reavis & Pogue, Cleveland, OH, Richard F. Shaw (briefed), Timothy B. Dyk (briefed), Andrew M. Kramer (argued and briefed), Daniel H. Bromberg (briefed), Harry I. Johnson, III, Clinton R. Pinyan, Jones, Day, Reavis & Pogue, Washington, DC, Robert M. Vercruysse (briefed), Ann M. Nicklas (briefed), Vercruysse, Metz & Murray, Bingham Farms, MI, for Detroit Free Press, Inc.
 Samuel C. McKnight (argued and briefed), Marshall J. Widick, Klimist, McKnight, Sale, McClow & Canzano, Southfield, MI, for Amicus Curiae Detroit Mailer Union No. 2040, et al.
 Leonard D. Givens (briefed), Martin C. Brook (briefed), Miller, Canfield, Paddock & Stone, Detroit, MI, Steven C. Kahn (briefed), Miller, Canfield, Paddock & Stone, Washington, DC, for Amicus Curiae New Employees.
 Before: KRUPANSKY, NELSON, and BATCHELDER, Circuit Judges.
 OPINION
 DAVID A. NELSON, Circuit Judge:
 
 
 1
 A regional director of the National Labor Relations Board, acting on behalf of the Board, here appeals the denial of a petition for temporary injunctive relief sought pursuant to § 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j). The question that we view as dispositive of the appeal is whether the district court abused its discretion in concluding that the Board had failed to show that the temporary relief sought--an order requiring immediate reinstatement of striking newspaper employees whose jobs had long since been filled by permanent replacements--would be "just and proper" within the meaning of those terms as used in the Act. Finding no abuse of discretion, we shall affirm the denial of the requested injunction.
 
 
 2
 * Respondents Detroit News and Detroit Free Press each published a daily metropolitan newspaper in Detroit, Michigan, prior to 1989. The two companies combined their non-editorial operations in 1989 under a joint operating agreement authorized by the Newspaper Preservation Act, 15 U.S.C. § 1803. Respondent Detroit News Agency, a partnership formed pursuant to the agreement, performs all non-editorial functions for both publishers, while each editorial department remains independent. It will be convenient for us to refer to the three respondents collectively as "the papers" or "the newspapers."
 
 
 3
 In 1992 the papers entered into three-year collective bargaining agreements with unions representing employees in ten different bargaining units. Prior to the expiration of the agreements on April 30, 1995, new contracts had been reached with four of the unions. Negotiations with the remaining unions were not crowned with success, and more than 2,000 employees went out on strike in mid-July of 1995. The strike--which the Board's Regional Director contends was caused, in part, by unfair labor practices committed by the papers in the course of their negotiations--was to prove long and bitter. The unions attempted to shut the papers down, but never succeeded in this effort.
 
 
 4
 In the summer of 1995 the papers began hiring permanent replacements. Close to 1,280 replacements have been hired, we are told, and the percentages of racial minorities and women on the payroll appear to have increased substantially as a result.
 
 
 5
 During 1995 the unions filed a number of unfair labor practice charges relating to the hiring of permanent replacements and (as to the Detroit News and the Agency) a variety of other matters as well. The Board's General Counsel issued complaints on these charges, asserting among other things that the strike was caused by the papers' alleged unfair labor practices and that the hiring of permanent replacements was improper. A consolidated amended complaint issued by the General Counsel on January 22, 1996, asked the Board for an order directing the papers, upon receipt of an unconditional return-to-work offer, to reinstate all of the strikers and discharge the permanent replacements if necessary. (Such relief would be available, under governing law, if the strike was an "unfair labor practice strike," but not if it was an "economic strike.")
 
 
 6
 In April of 1996 the case went to administrative trial on the General Counsel's fourth consolidated amended complaint--"Complaint I," as the district court was subsequently to call it. In June of 1997, after lengthy hearings, the administrative law judge before whom the proceedings had been held issued a decision and recommended order finding, among other things, that the strike was an unfair labor practice strike. The newspapers took exception to the ALJ's recommendation, and we are told that briefing before the Board itself has been completed.
 
 
 7
 In February of 1997, meanwhile, the unions presented unconditional return-to-work offers. Maintaining that the strike was an economic strike, the newspapers refused to discharge the permanent replacements; strikers were offered reinstatement only as vacancies occurred in the normal course of business. By July 22, 1997, the record indicates, the papers had offered reinstatement to approximately 300 strikers. Approximately 80 percent accepted the offers and returned to work.
 
 
 8
 On July 2, 1997--almost two years after the strike began, and 18 months after the General Counsel first asked the Board for a conditional reinstatement order--the General Counsel issued an amended complaint ("Complaint II" in the district court's terminology) based on charges that the papers had committed unfair labor practices by not granting immediate reinstatement to all strikers.[1] The complaint contained a request for the Board to order the newspapers immediately to reinstate all unfair labor practice strikers, displacing if necessary any replacement employees hired since July 15, 1995. Administrative adjudication of Complaint II has not yet been completed.
 
 
 9
 On July 7, 1997, acting on authorization granted by the Board a week earlier, Regional Director William C. Schaub filed a petition with the district court seeking injunctive relief under § 10(j) of the Act pending the Board's final disposition of Complaint II. The petition alleged that it was "essential,[2] just, proper and appropriate" for the court to order reinstatement of the strikers pendente lite. The theory advanced in support of this proposition was that the continued use of replacement workers in lieu of strikers who had offered to return to work would "irreparably damage the integrity of the collective bargaining process and [might] ultimately result in an irreparable dissipation of employee support for the Unions, by the scattering of the alleged discriminatees during Board litigation...."
 
 
 10
 In an opinion and order entered on August 15, 1997, the district court denied the request for injunctive relief. The petition was dismissed, and this appeal followed.
 
 II
 
 11
 Temporary injunctive relief may not be granted under § 10(j) unless the district court finds both that there is reasonable cause to believe that the alleged unfair labor practice occurred and that the relief sought would be "just and proper" on the facts presented. See Calatrello v. "Automatic" Sprinkler Corp. of Amer., 55 F.3d 208, 212 (6th Cir.1995); Kobell v. United Paperworkers Int'l Union, 965 F.2d 1401, 1406 (6th Cir.1992). In the case at bar the district court was not persuaded that either finding would be justified.
 
 
 12
 We deem it unnecessary to address the "reasonable cause" issue. Whether or not the district court decided that issue correctly, in our view, the court did not abuse its discretion in deciding the "just and proper" issue as it did.
 
 
 13
 The "just and proper" inquiry, our caselaw teaches, turns primarily on whether a temporary injunction is necessary "to protect the Board's remedial powers under the [National Labor Relations Act]...." "Automatic" Sprinkler, 55 F.3d at 214, quoting earlier cases. As we have had occasion to observe in connection with § 10(l)--and the observation is equally applicable to § 10(j)--"[c]ourts must be mindful that 'the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power.' " Gottfried v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 80, 927 F.2d 926, 928 (6th Cir.1991), quoting Gottfried v. Frankel, 818 F.2d 485, 494 (6th Cir.1987), a § 10(j) case. Where the Board's remedial powers would be ineffective without a court order temporarily returning the protagonists to the positions they occupied before occurrence of the alleged unfair labor practice, the district court normally has discretion to issue such an order.[3]
 
 
 14
 The Board advances two main arguments to support the proposition that the district court abused its discretion in concluding that the Board's interest in protecting the effectiveness of its remedial powers had not been shown to justify the issuance of a temporary order for immediate reinstatement of the strikers. First, says the Board, the papers' refusal voluntarily to reinstate the strikers "is an impediment to the collective bargaining process." Second, according to the Board, a temporary reinstatement order "is necessary to prevent further scattering of the strikers and thus preserve the [unions'] status and the efficacy of an ultimate reinstatement order." We do not find either argument persuasive.
 
 
 15
 As to the alleged impediment to the bargaining process, the district court found as a fact that the parties have continued to bargain throughout the strike. And it is not simply reinstatement on which the parties disagree; the record indicates that despite scores of bargaining sessions since the strike began, some 300 issues remain unresolved and the parties are still far apart in dollar terms.
 
 
 16
 The Board cannot "compel concessions or otherwise sit in judgment upon the substantive terms ... of collective bargaining agreements." NLRB v. American Nat'l Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). It is not up to the Board to weigh the merits of the bargaining positions taken by the papers at the negotiating table. And we see no basis for concluding that the district court was necessarily wrong in rejecting the claim that the bargaining process itself is being stymied by the presence of the replacement workers and will remain stymied unless the court acts to order reinstatement of the strikers prior to the Board's issuance of whatever remedial order the Board may ultimately deem appropriate.
 
 
 17
 As to the argument that a temporary injunction is necessary to prevent further "scattering" of striking employees, the district court observed that no order entered by the court would be likely to have much effect on strikers who had already found better permanent jobs or who had retired or relocated permanently, whether in this world or the next. Speculation as to the extent and pace of further scattering did not impress the district court as being a sound reason for concluding that the Board's remedial powers would be frustrated unless an injunction were issued. Given the state of the record, we cannot say that the court was wrong in its conclusion.
 
 
 18
 Uncontradicted expert testimony shows that the Detroit economy is sufficiently healthy to make it unnecessary, generally speaking, for strikers to leave the area for economic reasons during the pendency of the strike. And some 85 percent of the strikers eligible for reinstatement, the evidence shows, remain in the Detroit area. If the strikers can get by without relocating, on the other hand, the testimony indicates that the wages and benefits offered by the papers are sufficiently high to make it likely that if reinstatement were to be offered all eligible strikers within the next year or two, a majority would return to the papers. The acceptance of 80 percent of the reinstatement offers that have already been made supports this prognosis.
 
 
 19
 The continued existence and viability of the unions has not been shown to be in jeopardy here. The unions have been on the scene for a long time, and they appear to be strong and well financed. Whatever additional scattering of strikers may occur before the Board proceedings are concluded is unlikely to have more than a marginal impact on the status of the unions. To conclude otherwise, as the district court suggested, would simply be speculating.
 
 
 20
 As noted above (see n. 3, supra ), the underlying conduct addressed in Complaint I occurred quite some time ago. The Board could have authorized the filing of a § 10(j) petition as early as January of 1996, if not earlier, but the perception that a temporary injunction is "essential, just, proper and appropriate" does not seem to have struck the Board until July of 1997--more than 18 months later. We are given to understand that the Board is moving with all deliberate speed toward a final resolution of the proceedings before it, and if we cannot say with certainty that the request for injunctive relief now "stands just short of being moot," see Danielson v. Int'l Bhd. of Elec. Workers, Local Union No. 501, 509 F.2d 1371, 1374 (2d Cir.1975), we can at least observe that the end of the administrative road is considerably closer now than it was when proceedings under Complaint I were getting under way. The timing of a request for a temporary injunction under § 10(j) is by no means irrelevant to the question whether issuance of such an injunction would be just and proper.
 
 
 21
 Finally, we note that although the district court adverted to the financial hardships an injunction would work on the newspapers (to say nothing of the hardships it would work on the replacement employees), the court said that it did not take this factor into account in denying the injunction. The extent of such hardships is debatable, no doubt, but would clearly be significant. Counsel for the Board acknowledged at oral argument that the caselaw in this circuit does not flatly foreclose consideration of equitable factors such as this in § 10(j) cases, and we agree that it does not. The district court believed that "such factors, if considered, would weigh substantially in favor of a denial of the requested relief." We have no reason to disagree with this assessment, and it strengthens us in our conclusion that the denial of the injunction was not an abuse of discretion.
 
 
 22
 AFFIRMED.
 
 
 
 *
 This decision was originally issued as an "unpublished decision" filed on May 6, 1998. On July 20, 1998, the court designated the opinion as one recommended for full-text publication
 
 
 [1]
 Although the joint appendix does not contain the original version of Complaint II, and the Regional Director does not refer to it in his brief, the newspapers tell us that the original version was issued on April 3, 1997
 
 
 [2]
 The statute itself does not require the Board to show that an order sought under § 10(j) is "essential." Section 10(j) provides, in pertinent part, as follows:
 "The Board shall have power, upon issuance of a complaint ... charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court ... for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."
 
 
 [3]
 The alleged unfair labor practice on which Complaint II was based--the newspapers' refusal since February of 1997 to reinstate employees who, according to Complaint I, were unfair labor practice strikers--obviously came after the alleged unfair labor practices on which Complaint I was based. The Board not having requested § 10(j) relief upon the issuance of Complaint I, there may be a question as to the court's power to order a return to the state of affairs existing before the conduct complained of in Complaint I. We need not decide whether this power exists as a matter of law. We are constrained to say, however, that--at the very least--the Board's failure to seek timely § 10(j) relief in connection with Complaint I seriously weakens the force of its claim that issuance of a temporary injunction in connection with Complaint II would be just and proper
 As explained in the affidavit of Jerry M. Hunter, who served as General Counsel of the Board from 1989 until 1993, "[h]ad the Board believed that the hiring of permanent replacements created an impediment to bargaining that needed to be remedied pending the resolution of the unfair labor practice proceedings, it could have sought in late 1995 or early 1996 an injunction prohibiting the employers from informing striking employees that they would be permanently replaced, and requiring such employees to be reinstated upon an unconditional offer to return." If injunctive relief was not needed when the replacement workers were being hired, the argument that injunctive relief is needed at this late date is somewhat underwhelming.