In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3925

RIK LINEBACK, Regional Director of
the Twenty-Fifth Region of the National
Labor Relations Board, for and on
behalf of the NATIONAL LABOR
RELATIONS BOARD,

*Petitioner-Appellee*,

*v.*

SPURLINO MATERIALS, LLC,

*Respondent-Appellant*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 07 C 599—**David F. Hamilton,** *Chief Judge*.

ARGUED JUNE 6, 2008—DECIDED OCTOBER 8, 2008

Before BAUER, RIPPLE and MANION, *Circuit Judges*.

RIPPLE, *Circuit Judge*. The Coal, Ice, Building Material,
Supply Drivers, Riggers, Heavy Haulers, Warehousemen
and Helpers, Local No. 716 ("the Union") filed charges
with the National Labor Relations Board ("NLRB") against
employer Spurlino Materials, LLC ("Spurlino"), alleging
that Spurlino had committed multiple violations of the

federal labor laws. On March 21, 2007, the NLRB's General Counsel consolidated the charges against Spurlino and issued a formal complaint.

On May 11, 2007, the NLRB's Regional Director filed a section 10(j) petition in the district court, seeking a preliminary injunction pending adjudication of the charges by the NLRB. *See* 29 U.S.C. § 160(j). The district court held a hearing on the petition and, on November 8, entered an order enjoining Spurlino from engaging in a number of unfair labor practices. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

Spurlino, a full-service construction materials supplier, produces and sells ready-mix concrete. In November 2005, Spurlino acquired from another company, American Concrete Co., three ready-mix concrete plants in the Indianapolis area. Spurlino hired all or nearly all of the employees who had been working for American Concrete at each of these locations, and it maintained the seniority lists that had been put in place by American Concrete.

After the acquisition, Spurlino employees Ron Eversole, Gary Stevenson,[1] Matt Bales and others contacted the

---

[1] Stevenson is no longer employed by the company. The General Counsel alleged, and the ALJ subsequently found, that

(continued...)

Union. The Union petitioned the Board for a union repre-
sentation election. Thereafter, Eversole, Stevenson and
Bales led the unionization effort at Spurlino; they solicited
union authorization cards from employees and spoke
to employees about the Union.

### 1. Spurlino's Efforts to Undermine the Union

Prior to the election, Spurlino management allegedly
campaigned heavily to discourage its employees from
voting for union representation. Spurlino managers,
including manager Gary Matney, allegedly met individu-
ally with drivers to warn them that, if they voted for the
Union, things were going to get "ugly" at the company.
ALJ Tr. at 516. Multiple employees testified that Matney
had informed them that Spurlino successfully had
avoided unionization in the past and that, if the em-
ployees voted for the Union, the company would drag out
the contract negotiations and pay any fines that it might
incur. ALJ Tr. at 411-12, 600, 667. Spurlino's human
resources manager also allegedly encouraged employees
to vote against the Union.

On January 13, 2006, employees at Spurlino's Indianapo-
lis plants voted in a secret ballot election conducted by the
NLRB. Despite the efforts of the company to persuade

---

[1] (...continued)
Stevenson's discharge was in violation of the labor laws;
however, these allegations were not included in the Director's
petition for injunctive relief. Therefore, we do not consider
them here.

them otherwise, a majority of the employees voted to be represented by the Union. Soon thereafter, Matney allegedly told an employee that the workers would not be receiving a wage and benefit increase that Spurlino had planned to implement because the employees had voted for the Union. ALJ Tr. at 516, 577-78. Matney also allegedly warned employees that things would be getting much worse at the company.

After the election, the NLRB certified the Union as the employees' exclusive collective bargaining representative.[2] Spurlino and the Union accordingly began negotiations over their first labor contract in February 2006. Although the Union and the company held thirteen bargaining sessions between February 2006 and January 2007, the negotiations made little progress, and, on the record before us, the parties still have been unable to reach an agreement. The Union contends that this lack of progress is the result of an attempt by Spurlino to drag out negotiations, consistent with its earlier threats.

Meanwhile, attendance at Union meetings by Spurlino employees has declined significantly, from 12-15 employees in February 2006, to 2-4 employees by mid-2007. According to testimony from employees, fears of being seen at Union meetings and frustration with the lack of

---

[2] There are approximately 35 employees in the bargaining unit. Approximately 15 of these employees are drivers who work from Spurlino's Kentucky Avenue facility. Eversole, Stevenson and Bales served as the Union's employee bargaining committee members.

progress on a contract have caused this decline in attendance.

## 2. Spurlino's Discrimination Against Union Organizers

Spurlino's alleged efforts to undermine the Union did not end with the election. The charges in this case involve allegations of discrimination against Union leaders and refusal to bargain with the Union over changes in terms and conditions of employment, specifically in the method that Spurlino uses to assign work to its ready-mix concrete truck drivers.

Spurlino ordinarily dispatches its concrete truck drivers based on their position on a call list, which is ordered according to seniority. For example, at all relevant times, Union leader Ron Eversole has been first on Spurlino's call list because he is the most senior driver at the Kentucky Avenue facility. Because of his position on the call list, Eversole is dispatched first on any given work day. The dispatcher then moves down the call list until all drivers scheduled to work that day have been dispatched at least once. After drivers deliver their first loads of the day and return to the facility, they are dispatched to other jobs on a first-back, first-out basis.

In December 2005, Spurlino was awarded a large contract to provide ready-mix concrete for the construction of a new football stadium for the Indianapolis Colts. Construction work on the stadium project was covered by a labor agreement, the Project Labor Agreement for Work Stabilization for Stadium and Convention Center

Expansion Construction ("PLA"), which was negotiated by the numerous contractors and unions involved in the project. As a condition of receiving the contract for the stadium project, Spurlino was required to become a party to the PLA and to abide by its terms when performing work on the stadium.

The PLA required companies contracted to work on the stadium project to pay wages and benefits greater than those that Spurlino generally paid. In compliance with the PLA, Spurlino paid its drivers a higher wage and more generous benefits for work performed on the stadium project than for the same work performed for other Spurlino customers; therefore, the drivers generally preferred to be dispatched to work on the stadium project. Spurlino's method for assigning drivers to the stadium project thus determined who would benefit from the higher wages provided under the PLA.

Spurlino initially serviced the stadium project by delivering concrete from its Kentucky Avenue plant, which is four or five miles away from the stadium. The Union requested that Spurlino dispatch drivers to the stadium project by seniority, according to the call list. Spurlino argued before both the ALJ and the district court that it simply integrated the stadium project dispatches into its regular seniority-based call list—if the stadium project dispatch was the first dispatch, then it went to Eversole, if it was the second it went to Mooney, and so on. Nevertheless, Spurlino also maintained the position that the PLA governing the stadium project itself required that

seniority would play no role for purposes of the project.[3]

According to the Union, Spurlino allegedly manipulated its dispatches to the stadium project in an effort to punish Union leaders Eversole, Stevenson and Bales for their Union activities. Specifically, the Director alleged that Spurlino disregarded its usual "first-back, first-out" policy and dispatched other drivers to the stadium project out of order so that Eversole, Stevenson and Bales would not receive these valuable assignments. Spurlino, on the other hand, denies that it manipulated the dispatching during this time period.

As the stadium project began to require greater volumes of concrete, Spurlino decided to build a temporary and

---

[3] The PLA stated:

> 2.3. . . . This Agreement (including the applicable bargaining agreements listed in Attachment C, and successor agreements thereto) represents the complete understanding of the Parties with respect to the issues covered hereunder. The provisions of this Agreement shall control the construction of this Project and take precedence over and supersede provisions of all the Unions' collective bargaining agreements, national, area, or local, which conflict with the terms of this Agreement. However, the national, area, and local collective bargaining agreements will govern all issues not addressed in this Agreement.
>
> . . . .
>
> 3.12. Individual seniority will not be recognized or applied to employees working on this Project.

R.19, Joint Ex. 4 at 12.

portable concrete plant on the stadium property. The portable plant was dedicated to providing concrete for the stadium project only, and it operated only on days that the stadium project had large daily demands for concrete. Again, because the drivers providing services for the stadium project received higher wages and benefits under the PLA, the portable plant was a highly desirable work assignment. Accordingly, the method of selecting employees who would work at that plant was important to the employees, and the Union requested that the portable plant drivers be selected by seniority. Spurlino declined to do so, citing the PLA.

Spurlino initially sought volunteers from the Kentucky Avenue plant to work at the portable plant. Spurlino managers informed the drivers that, if there were more volunteers than positions available, then selection would be based on the drivers' skills, qualifications and past performance. These considerations included performance on a driver test, attendance records, timeliness, truck cleanliness and overall attitude. Unlike Spurlino's usual practice, seniority would be used only to distinguish between two otherwise equally qualified candidates. Spurlino also allegedly informed the drivers that anyone assigned to the portable plant would lose his seniority at the Kentucky Avenue plant, even when the portable plant was not in operation and he returned to the Kentucky Avenue plant.

Despite the significant wage increase and benefits for those drivers assigned to the portable plant, Bales did not volunteer for one of these positions. He stated that he

declined to seek a position there because the employees were told that they would lose their seniority at the Kentucky Avenue facility if they transferred to the portable plant. Eversole testified that he applied for a portable plant position, but that Spurlino filled the position without acknowledging his application.

Stevenson applied for one of the positions at the portable plant. He, like the other volunteering drivers, was asked to take a driving test on a rear-loading truck—the type of truck that Spurlino wished to use at the portable plant—to assist Spurlino in determining who had the necessary skills, qualifications and past performance to work at the portable plant. Terry Mooney refused to take the driving test and had no prior experience driving rear-loading trucks. Eric Kiefer also had no experience with rear-loading trucks, and, during the driving test, he broke the brakes on the truck. Stevenson, on the other hand, performed well on the driving test and was high on the seniority list.

On June 7, 2006, Spurlino announced that the portable plant drivers would be Mooney, Kiefer and two other employees, Thomerson and Penatello, who had worked for Spurlino less than two months before they were selected as portable plant drivers. Despite Stevenson's seniority and his high score on the driving test, Spurlino did not assign him to the portable plant. According to Spurlino, the four selected drivers had better overall performance scores than the other drivers who had applied, referring to a thirteen-factor performance review card completed by the company during the selection process.

Soon thereafter, one of the original portable plant drivers resigned from the company. Spurlino asked both Eversole and Bales if they wished to replace him as a driver at the portable plant. Both testified that they declined the position when Spurlino's management again told them that they would lose their seniority status on the Kentucky Avenue call list upon their return.

Around this time, Spurlino allegedly decided to create a new position of "alternate/backup" driver at the portable plant; however, it did not post this position or inform the Union. Instead, it approached drivers individually for the position and informed them that these alternate/backup drivers would be allowed to keep their places on the Kentucky Avenue call list because they were merely alternates. Spurlino selected three drivers to be alternate/backup drivers. One of these drivers had been employed at Spurlino less than two months before being given the job at the portable plant. Spurlino never offered Union leaders Eversole and Bales the alternate/backup driver position, allegedly because they already had declined an offer to work at the portable plant.

The portable plant remained in operation from June 2006 until February 2007. Once demand for high daily volumes of concrete dwindled at the stadium, however, Spurlino closed the portable plant. Despite its initial proclamations otherwise, after Spurlino closed the portable plant, it reassigned the portable plant drivers to the Kentucky Avenue facility and fully restored their previous seniority there. The Director alleges that the company initially misinformed the drivers that they would lose their seniority so that the Union leaders, who were all high on the

seniority list, would be discouraged from applying for a portable plant position.

## B. Administrative and District Court Proceedings

In August 2006, the Union filed a series of charges against Spurlino, alleging unfair labor practices. These charges were consolidated by the General Counsel into a formal NLRB complaint. The complaint included allegations that the company had: (1) unlawfully discriminated against Eversole, Bales and Stevenson because of their union activities; (2) changed pre-existing policies of assigning work based on seniority without bargaining with the Union; and (3) unilaterally implemented an evaluation procedure for purposes of assigning certain work without bargaining with the Union.

The Board's ALJ conducted a hearing on these charges from April 24, 2007 to April 27, 2007, and then it declared a recess until July 10, 2007. On May 11, 2007, the Board's Regional Director filed a section 10(j) petition in the district court, requesting injunctive relief pending the final decision of the Board. The ALJ then decided to accelerate the conclusion of the administrative hearing, and it heard evidence on May 30 and 31, 2007. Accordingly, the Regional Director requested that the hearing on the preliminary injunction in the district court be postponed until June so that the district court could consider the findings of the ALJ.

The district court conducted a hearing on June 22, 2007, to hear evidence on the need for injunctive relief beyond that presented at the administrative hearing. On November

8, 2007, the district court concluded that the testimony, arguments and briefs presented in the district court, as well as the record in the administrative proceeding, weighed in favor of granting injunctive relief. Specifically, the court noted that:

> [T]he Director has shown a sufficient likelihood that Spurlino engaged in at least several of the charged unfair labor practices in violation of federal labor law. The Director has introduced substantial evidence that the company acted intentionally to punish publically the principal union organizers for their activities and to modify terms and conditions of employment unilaterally. The effect and intent have been to show all employees in the bargaining unit that the newly-elected union could not deliver any improvement in wages and working conditions.

 R.30 at 2.

The district court further concluded that preliminary injunctive relief under section 10(j) was " 'just and proper' because the company's actions have had substantial effects in discouraging union activity and demoralizing the unionized employees." *Id*. at 3. Accordingly, on November 8, 2007, the court entered an order enjoining Spurlino from:

> (1) retaliating, through discriminatory job assignments or otherwise, against leaders and members of the [Union], based upon those persons' union membership, support, activity, or affiliation;
>
> (2) acting unilaterally to change terms and conditions of employment for those Spurlino Materials employees in the bargaining unit represented by the union;

(3) failing and refusing to bargain in good faith with the union over a collective bargaining agreement; and

(4) in any like manner interfering with, restraining, or coercing employees' exercise of their rights under Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, pending final resolution of the unfair labor practice charges now pending against Spurlino Materials, LLC based on activity in the company's Indianapolis-area facilities.

R.31 at 1-2. On December 4, 2007, Spurlino timely appealed.

On December 17, 2007, the ALJ issued a decision in the underlying case. He concluded that Spurlino had violated section 8(a)(3) by discriminating against Eversole, Bales and Stevenson in job assignments at the portable plant. He also found that Spurlino had violated section 8(a)(5) because it unilaterally established unit positions, and the selection criteria used to staff them, without bargaining with the Union. An appeal of this decision currently is pending before the NLRB.

## II

## DISCUSSION

### A. The Decision to Grant Injunctive Relief

Section 10(j) of the National Labor Relations Act ("NLRA") authorizes a district court to order injunctive relief pending the NLRB's final disposition of an unfair labor practices claim if such relief would be "just and

proper." 29 U.S.C. § 160(j). The court looks to the same factors to which it looks in other contexts when deciding whether to grant injunctive relief: "the lack of an adequate remedy at law, the balance of potential harms posed by the denial or grant of interim relief, the public interest, and the petitioner's likelihood of success on the merits of its complaint." *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 286 (7th Cir. 2001) (citing *Kinney v. Pioneer Press*, 881 F.2d 485, 490 & n.3, 493 (7th Cir. 1989)); *see also NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1566 (7th Cir. 1996), *cert. denied*, 519 U.S. 1055 (1997). The Regional Director is entitled to interim relief when:

> (1) the Director has no adequate remedy at law;
>
> (2) the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction;
>
> (3) "public harm" would occur in the absence of interim relief;
>
> (4) the Director has a reasonable likelihood of prevailing on the merits of his complaint.

*Bloedorn*, 276 F.3d at 286. The Director bears the burden of establishing the first, third and fourth of these circumstances by a preponderance of the evidence. *Id*. The second prong is evaluated on a sliding scale: The better the Director's case on the merits, the less its burden to prove that the harm in delay would be irreparable, and vice versa. *Id*. at 286-87.

We review the district court's decision to grant interim injunctive relief under section 10(j) for an abuse of discre-

tion. *Bloedorn*, 276 F.3d at 286; *Electro-Voice*, 83 F.3d at 1566. We examine the district court's decision only to ensure that it does not "depend[] on faulty legal premises, clearly erroneous factual findings, or improper application of the criteria governing preliminary injunctive relief." *Electro-Voice*, 83 F.3d at 1566 (quoting *Kinney*, 881 F.2d at 493).

## 1. Adequate Remedies at Law

As we noted in *Bloedorn*, "[s]ection 10(j) relief is an extraordinary remedy . . . reserved for 'those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process.'" 276 F.3d at 297 (quoting *Szabo v. P\*I\*E Nationwide, Inc.*, 878 F.2d 207, 209 (7th Cir. 1989)). We first consider whether the district court clearly erred when it determined that the rights of the employees under the NLRA would suffer irreparable harm from the passage of time between the filing of charges and the resolution of the complaint by the NLRB. *Id.*; *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) ("Only if [the employees] will suffer irreparable harm in the interim—that is, harm that cannot be prevented or fully rectified by the final judgment after trial—can [they] get a preliminary injunction.").

The process of NLRB resolution has long been recognized as extraordinarily slow—indeed, the purpose of section 10(j) was to prevent employers from taking advantage of this significant passage of time in their efforts to quash

union support in the interim. *See NLRB v. P\*I\*E Nationwide, Inc.*, 894 F.2d 887, 891 (7th Cir. 1990); *Szabo*, 878 F.2d at 209-10; *Kinney*, 881 F.2d at 493-94. The longer that an employer is able to chill union participation or avoid bargaining with a union, the less likely it is that the union will be able to organize and to represent employees effectively once the NLRB issues its final order. *See Bloedorn*, 276 F.3d at 299; *see also Electro-Voice*, 83 F.3d at 1573; *Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 971 (6th Cir. 2001) (noting the significant effects of chill on the ability of a union to organize). This risk is particularly true in cases involving fledgling unions, where the passage of time is especially critical. *See Arlook v. S. Lichtenberg & Co., Inc.*, 952 F.2d 367, 373 (11th Cir. 1992).

Here, the district court, noting the precipitous decline in Union participation, credited the testimony of many Spurlino employees who stated that they were hesitant to attend Union meetings because they feared discrimination. If Spurlino is allowed to proceed in its quest to defeat the Union before it becomes established, the court found, then merely requiring the company to pay its employees damages after the fact will not remedy the adverse impact to the Union and the employees in the interim period.

Spurlino contends that immediate injunctive relief is unnecessary in this case. In support, it notes that the Regional Director filed a motion to postpone for a few weeks the district court's hearing on the preliminary injunction, which, in Spurlino's view, shows that the need for injunctive relief is not urgent. *See Schaub v. Detroit*

*Newspaper Agency*, 154 F.3d 276, 280 (6th Cir. 1998) (holding that the Director's 18-month delay in filing a petition for injunction showed that interim relief was unnecessary); *but see Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir. 1987) (holding that delay is a factor that may be considered, but it is not particularly probative; the question is whether interim relief is necessary to restore the parties to the status quo). Spurlino also contends that evidence in the record shows that the Union is not in precipitous decline, and it suggests that any reduction in attendance at Union meetings is because the meetings are held on Friday evenings, a popular time for other activities.

Spurlino's arguments, however, show only that there may be an alternative view of the evidence presented to the district court; they do not establish that the district court's view of the evidence was clearly erroneous. After a review of the record, we must conclude that the district court did not clearly err when it found that an award of damages in future years would be an inadequate remedy in this case.

## 2. Balance of Harms

For the same reasons that the district court concluded that the Director has no adequate remedy at law, it also concluded that the employees are likely to suffer substantial and irreparable harm if Spurlino is allowed to continue its effort to subvert the Union until the case is resolved by the NLRB. As we noted in *Electro-Voice*:

> The deprivation to employees from the delay in bargaining and the diminution of union support is im-

measurable. That loss, combined with the likelihood that the Board's ability to rectify the harm is diminishing with time, equals a sufficient demonstration of irreparable harm to the collective bargaining process.

83 F.3d at 1573.

Spurlino first contends that the Director cannot show a likelihood of irreparable harm during the interim period because the actions about which the employees complain largely involved assignments to the portable plant, which is no longer in operation. The district court disagreed, however, and noted that Spurlino continues to make daily decisions about other work assignments and the terms and conditions of employment. The court concluded that the Director had presented evidence of Spurlino's clear hostility toward the Union, as well as a pattern of discrimination against employees active in the Union. It found that there was a substantial risk that Spurlino would continue its efforts to undermine the Union while the dispute was pending before the NLRB, and that irreparable harm was likely to result. After a review of the record, we cannot say that the district court's view of the evidence was clearly erroneous.

Spurlino next contends that an injunction would present a risk of substantial and irreparable harm to the company because it would subject it to contempt proceedings upon any further allegations of labor law violations. Although an injunction certainly would restrict Spurlino's ability to engage in unfair labor practices, as well as perhaps subject it to an increased risk of unwarranted contempt proceedings, Spurlino does not explain why this potential

harm would be *irreparable*. Furthermore, even if the company were at risk of irreparable harm, Spurlino makes no effort to weigh this risk against the risk of harm to the Union.

Additionally, the strength of the Director's case on the merits affects a court's assessment of the relative harms posed by the grant or denial of injunctive relief: The greater a party's prospects of prevailing on the merits, the less compelling a showing of irreparable harm is required. *Bloedorn*, 276 F.3d at 286-87; *Electro-Voice*, 83 F.3d at 1568. As we discuss below, the district court's conclusion that the Regional Director has a high likelihood of success on the merits is supported by the record; accordingly, he need not make an extremely strong showing of irreparable harm in order to warrant granting interim relief.

### 3. Public Interest

The district court concluded that granting preliminary injunctive relief here was in the public interest. As we noted in *Electro-Voice*, "[t]he public interest is furthered, in part, by ensuring that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." 83 F.3d at 1574 (internal quotation marks and citation omitted). Spurlino presented no evidence of public harm to challenge the district court's decision. Accordingly, we conclude that the district court correctly determined preliminary injunctive relief in this case to be in the public interest.

**4. Likelihood of Success on the Merits**

We have held that, "in evaluating the likelihood of success, it is not the district court's responsibility, nor is it ours, to rule on the merits of the Director's complaint"; deciding the merits of the case is the sole province of the Board. *Bloedorn*, 276 F.3d at 287. Our inquiry is confined to the *likelihood* that the Director will prevail before the Board. *Id.* "For our purposes, we must decide whether the Director has a better than negligible chance of success: whether the Director has 'some chance' of succeeding on the merits." *Electro-Voice*, 83 F.3d at 1568. In evaluating this likelihood, "given the Board's expertise in matters of labor relations, we must be 'hospitable' to the General Counsel's view of the law." *Bloedorn*, 276 F.3d at 287 (citation omitted). We also must give some measure of deference to the view of the ALJ, *id*. at 288,[4] as well as our traditional deference to the findings of the district court. On this appeal, we are asked only to determine whether the district court clearly erred when it concluded that the Regional Director's evidence was sufficient to establish a "better than negligible" chance of success on the merits. *Electro-Voice*, 83 F.3d at 1570.

---

[4] The ALJ's opinion certainly is relevant to the propriety of section 10(j) relief. Evaluating the Director's likelihood of success calls for a predictive judgment about how the NLRB is likely to rule. The ALJ is the NLRB's first-level decisionmaker, and, "[h]aving presided over the merits hearing, the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed." *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001).

The district court considered the entire record, including the testimony of Union supporters, employees either neutral or against the Union and management. It concluded that the Director had made a strong showing of a likelihood of success on the merits on the retaliation/discrimination charge. It also concluded that the Director had made a strong showing of likelihood of success on the merits of the charge that Spurlino made unilateral changes in the terms and conditions of employment without bargaining over those issues. Finally, the court concluded that the Director had made "at least a substantial showing" that Spurlino had not been bargaining in good faith. R.30 at 23.

Spurlino's main contention is that the PLA that governed the stadium project superceded any obligations that the company might have had to bargain with the Union or to respect its employees' seniority; the company also contends that the PLA provided it with the right to assign the stadium project work to whomever it pleased. In support of its contention, Spurlino points to section 3.12 of the PLA, which states: "Individual seniority will not be recognized or applied to employees working on the Project." R.19, Joint Ex. 4, at 12.

The district court, however, considered this argument and concluded that "Spurlino's position misinterprets the PLA." R.30 at 18. In the view of the district court, the PLA provision barring individual seniority meant only that there would be no effort to recognize seniority as between employees of different employers working at the stadium site. Such a provision was sensible, it noted,

considering that managing the large stadium project likely would be nearly impossible if individual seniority had to be recognized among different employers. The court concluded that the many major unions whose members worked on the stadium had not surrendered all of their employees' internal seniority rights by signing on to the PLA. *Id*. It noted that other provisions of the agreement specified that, unless there was a specific conflict between the PLA and existing collective bargaining agreements, the collective bargaining agreements would remain in effect.

The ALJ took the same view as the district court. He also concluded that, even if Spurlino had no obligation to assign the most senior drivers to the portable plant, the company's treatment of the portable plant drivers' overall seniority still violated section 8(a)(5) because an employee's work at the stadium project adversely affected the terms and conditions of the rest of his employment with the company (i.e., he was moved to the bottom of the Kentucky Avenue seniority list). Accordingly, we cannot say that the district court's interpretation of the PLA was unreasonable.

In sum, we conclude that the district court properly considered the relevant factors when deciding whether to issue a preliminary injunction. Spurlino failed to show that the court relied upon an error of law or a clearly erroneous interpretation of the evidence in the record. Therefore, we hold that the district court did not abuse its discretion when it granted the Director's motion for interim injunctive relief under section 10(j).

**B. Scope of the Injunction**

Although we review the decision to grant injunctive relief for an abuse of discretion, "whether the terms of an injunction fulfill the mandates of Rule 65(d) is a question of law that we review without deference." *See Int'l Rectifier Corp. v. Ixys Corp.*, 383 F.3d 1312, 1315 (Fed. Cir. 2004).

Federal Rule of Civil Procedure 65(d) requires that injunctions be stated specifically and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Injunctions that "merely instruct the enjoined party not to violate a statute" generally are overbroad, increasing "the likelihood of unwarranted contempt proceedings for acts unlike or unrelated to those originally judged unlawful." *Ixys*, 383 F.3d at 1315.

As the Supreme Court has explained:

> A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past. But the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged.
>
> . . . .

> To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past.

*NLRB v. Express Pub. Co.*, 312 U.S. 426, 435-37 (1941).

Spurlino objects to paragraph 1 of the injunction because it bars retaliation against *all* members of the Union, "through discriminatory job assignments *or otherwise*." R.31 at 1. The complaint, it notes, merely alleged that Spurlino had discriminated against Union leaders Eversole, Bales and Stevenson—not all the other members of the Union. Spurlino contends that the district court had no reason to believe that it was likely to retaliate against others. It also submits that the court's use of "otherwise" is vague and overbroad. Similarly, Spurlino objects to paragraph 2 of the injunction because it enjoins *all* unilateral actions to change the terms and conditions of employment, although the only allegations of unilateral action in the complaint involved the portable plant. Spurlino submits that there is no evidence that the company has taken or will take other unilateral actions, and the court's prohibition against all unilateral action therefore is overbroad.

In our view, the district court reasonably found a continuous and deliberate effort on the part of Spurlino to undermine the Union organization effort. Accordingly, it concluded that there was a likelihood that the company would act further to thwart the Union's efforts; it also found that Spurlino was likely to refuse to negotiate with the Union on the terms and conditions of employment

in the future. Given these specific findings, supported by evidence in the record, paragraphs 1 and 2 do not exceed the scope of the court's authority to enjoin similar actions by the company. *See Express*, 312 U.S. at 435 ("A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past.").

Spurlino also objects to paragraph 3 of the injunction on the ground that it is overbroad. Although the Director's petition for an injunction included no allegations of a *general* refusal to bargain, the district court found that Spurlino had refused to bargain in good faith throughout the eighteen months of contract negotiations with the Union: Therefore, it enjoined the company from "failing and refusing to bargain in good faith over a collective bargaining agreement." R.31 at 2. Spurlino contends that the injunction against a general failure to bargain was unwarranted because it was broader than the specific charges in the complaint.

The cases upon which Spurlino relies are not controlling. Spurlino invites our attention to *Gottfried v. Frankel*, 818 F.2d 485 (6th Cir. 1987), which vacated a part of an injunction that prohibited the employer from failing to bargain because no failure-to-bargain section 8(a)(5) claim was alleged. The court there emphasized, however, that the parties had stipulated that this was not a "refusal to bargain" case, and the district court had characterized all of the allegations as violations of sections 8(a)(1) or (3), and

not section 8(a)(5). *Id*.; *see also Gaddy v. Abex Corp*., 884 F.2d 312, 318 (7th Cir. 1989) (holding that an injunction against retaliation was improper because there never was any allegation of retaliation by the defendants). Here, on the other hand, the Director did allege a violation of section 8(a)(5). *See* R.1 at 6. He also introduced evidence that the company intentionally had been dragging out negotiations and undermining Union support within the company. The district court concluded from this evidence that there had been a pattern of refusal to bargain on the part of the company and that further refusals were likely:

> Keeping in mind this court's limited role, for present purposes, the court finds that the weight of evidence tends to favor the Board's position on this question. Eversole and Bales have no incentive to drag out the bargaining. Spurlino's conduct in making unilateral changes without bargaining over them, and the substantial evidence of a broader campaign to undermine the union by means both fair and foul, together persuade the court that Spurlino appears not to be bargaining in good faith.

R.30 at 21. The district court determined that this element of the injunction was necessary "to remedy the company's long strategy of delay and obstruction of the union's ability to represent its members effectively." *Id*. at 28.

Therefore, its injunction against similar refusals to bargain collectively was within its discretion. The Director brought a claim regarding a specific instance of Spurlino's refusal to bargain, and the district court reasonably determined that similar refusals were likely.

"[H]aving found in this case that respondent has refused to bargain," *Express*, 312 U.S. at 432, the district court acted within its authority when it enjoined generally additional refusals to bargain. *See also id.* at 435; *NLRB v. Mayrath Co.*, 319 F.2d 424, 428 (7th Cir. 1963).

Finally, Spurlino contends that paragraph 4 of the injunction is overbroad because it enjoins the company from "in any like manner interfering with, restraining, or coercing employees' exercise of their rights under Section 7 of the [NLRA]." R.31 at 2. Spurlino contends that this generalized provision is strikingly similar to the order, struck down by the Supreme Court in *Express*, which enjoined the company from "in any manner interfering with, restraining, or coercing its employees in the exercise of their rights . . . as guaranteed in Section 7 of the Act." 312 U.S. at 430.[5]

---

[5] *See also NLRB v. Ampex Corp.*, 442 F.2d 82, 86-87 (7th Cir. 1971) (striking as overbroad an order that prevented the company from acting "in any other manner" to violate the Act); *NLRB v. Elliott-Williams Co.*, 345 F.2d 460, 464-65 (7th Cir. 1965) (striking down as overbroad a portion of an order that enjoined an employer from "in any other manner" interfering with its employees' organizational and bargaining rights); *NLRB v. Thompson Ramo Woolridge, Inc.*, 305 F.2d 807, 810-11 (7th Cir. 1962) (refusing to enforce an order that prohibited violations of the statute "in any other manner"); *NLRB v. J.I. Case Co.*, 134 F.2d 70, 73 (7th Cir. 1943) (refusing to enforce an order restraining violations of the act "in any manner"); *NLRB v. Stone*, 125 F.2d 752, 757 (7th Cir. 1942) (similarly striking down an injunction prohibiting violations "in any other manner").

The provision at issue in this case, at first blush, does appear strikingly similar to the injunction found to be overbroad in *Express*; nevertheless, there is one important distinction. The order struck down in *Express* prohibited the company from "in *any* manner" violating the Act, 312 U.S. at 430; the district court's order in this case, however, is conditioned by the words "in any *like* manner." R.31 at 2. Although the Supreme Court rejected broad injunctions simply "to obey the statute," it expressly noted that, when an employer is found to have violated the labor laws, district courts maintained broad authority to restrain employers from committing "other related unlawful acts." *Express*, 312 U.S. at 435-36.

In *NLRB v. Mutual Maintenance Service Co., Inc.*, 632 F.2d 33, 37 n.5 (7th Cir. 1980), we enforced an order of the NLRB that prevented the employer from, "in any like manner, interfering with, restraining or coercing its employees in the exercise of the rights under Section 7 of the Act." Although we did not address specifically whether this provision was overbroad, we did note with approval the fact that the NLRB's final order had substituted the "narrower language" of "in any *like* manner" for the ALJ's recommended "any *other* manner." *Id.* (emphasis added). Similarly, in *Electromation, Inc. v. NLRB*, 35 F.3d 1148, 1155 (7th Cir. 1994), we enforced an order with almost identical language to the order in this case. There, the Board's order required the company to: "(1) cease and desist from dominating, assisting, or otherwise supporting the action committees and in any like manner interfering with, restraining, or coercing employees in

the exercise of their Section 7 rights." *Id.*; *see also NLRB v. H.P.&T. Inc.*, 947 F.2d 945 (6th Cir. 1991); *NLRB v. Aquatech, Inc.*, 926 F.2d 538, 539 (6th Cir. 1991) (enforcing similar orders).

The injunction at issue here prohibits only those actions similar to the violations already committed by Spurlino; it does not encompass unrelated violations of the NLRA. It is therefore supported by our case law. Accordingly, we must hold that the injunction issued in this case is sufficiently specific to survive scrutiny under Federal Rule of Civil Procedure 65(d) and the standard set forth in *Express*.

### Conclusion

For the reasons explained in this opinion, we affirm the judgment of the district court.

AFFIRMED

MANION, *Circuit Judge*, concurring. I write separately simply to reiterate that the third paragraph of the injunction does not enjoin *any* refusals to bargain, but, as the court holds, *supra* at 26, only those refusals to bargain that are *similar* to those alleged by the Director and found by the district court. The Director alleged in its petition that Spurlino created the positions of portable batch plant driver and back-up portable batch plant driver without giving prior notice to the Union and without affording the Union an opportunity to bargain with Spurlino over those positions. Pet. for Inj. 5-6. Notably, the Director did *not* allege that Spurlino was engaging in overall bad-faith bargaining. With that in mind, I join the court's opinion in full.